Bruce I. Afran
Attorney-at-Law
10 Braeburn Dr.
Princeton, New Jersey 08540
609-454-7435 (cellular)
bruceafran@aol.com
NJ Attorney ID 010751986
*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

| | |
|---|---|
| CYNTHIA STEPIEN on behalf of herself and her minor child; STAMATIA DIMATOS SCHRECK, on behalf of herself and her three minor children; RYAN CODY, on behalf of himself and his minor child J.C.; KELLY FORD on behalf of herself and her minor child A.F.; GABE MCMAHON; M.F.; M.K.N.; K.B.; B.W.; L.R.; J.V.P.; V.P.; D.M.; B.M.; A.M.; DANIELLE ESCAYG; and ALL OTHERS SIMILARLY SITUATED, | **SECOND AMENDED COMPLAINT** |

Plaintiffs,

v.

PHILIP D. MURPHY, Governor; ANGELICA ALLEN-McMILLAN, Commissioner of Education; JUDITH M. PERSICHILLI, Commissioner of Health,

DOCKET NO: 21-cv-13271

Defendants.

_____

**<u>INTRODUCTION</u>**

1.  Plaintiffs are students in New Jersey public schools, and will be students in September 2021, appearing in this action in their own names and, where necessary, with the consent of their parents.

2.  Other plaintiffs are parents of minor children who will be attending public schools in New Jersey, appearing for themselves and on behalf of their minor children.

1

3.   Plaintiff DANIELLE ESCAYG, a resident of Belmar, is a special education teacher at Red Bank Regional school.

4.   All plaintiffs appear on behalf of themselves and others similarly situated.

5.   All plaintiffs seek declaratory relief that New Jersey's mandatory mask mandates for schoolchildren, and other policies or orders isolating and segregating schoolchildren from each other and from teachers and staff purportedly to prevent Covid transmission, or future such orders, are unconstitutional and violate the First, Fifth and 14th Amendments to the United States Constitution.

6.   Plaintiffs seek injunctive relief: 1) barring defendants from compelling the wearing of face masks by schoolchildren during the school day and certain other requirements purporting to prevent Covid transmission, as described herein; 2) directing that defendants vacate and rescind all such orders; and 3) that defendants issue affirmative orders barring school districts from promulgating or implementing mask mandates and other Covid-related preventative, isolation and segregation policies.

7.   Plaintiffs Ryan Cody and Kelly Ford seek additional declaratory relief (Count IV) that the state and/or its school districts or officials may not impose mandatory Covid testing of schoolchildren without express, written parental consent, along with appropriate injunctive relief barring such practice.

**PLAINTIFFS**

8.   Plaintiff CYNTHIA STEPIEN is a parent of a minor school child entering the third grade at Woodside Elementary School in the River Vale School District.

9.  Plaintiff STAMTIA DIMATOS SCHRECK is a parent of three minor children attending the Ramapo Bridge Middle School and the George Washington Elementary School in the Mahwah School District.

10. Plaintiff RYAN CODY is a parent of J.C., a student at Peter Muschal Elementary School in the Bordentown School District, Bordentown, New Jersey.

11. Plaintiff KELLY FORD is a parent of her minor daughter A.F., who will be a sophomore at Barnegat High School; Plaintiff Kelly Ford has consented to her son M.F., who will be a senior at Barnegat High School, appearing in this action on his own behalf.

12.  Plaintiff SIMONA CHINDEA is a parent of two minor children attending school in the West Orange school district in Essex County.

13.  Plaintiff GABE MCMAHON, age 18, is a student at Middletown South High School in Middletown, New Jersey.

14.  Plaintiff M.F. is a student at Barnegat High School in Ocean County, New Jersey.

15.  Plaintiff M.K.N. is a student at Jackson High School in Jackson, New Jersey.

16.  Plaintiff K.B. is a student at Southampton High School in Burlington County, New Jersey.

17.  Plaintiff B.W. will be a junior at a public high school in Monmouth County, New Jersey.

18.  Plaintiff L.R. is a student at Jackson High School in Jackson, New Jersey.

19.  Plaintiff J.V.P. is a student at Old Bridge High School in Old Bridge, New Jersey.

20.  Plaintiff V.P. is a student at Old Bridge High School in Old Bridge, New Jersey.

21.  Plaintiff D.M. is a student at John P. Stevens High School in Edison, New Jersey.

22. Plaintiff B.M. is a sophomore at Middletown South High School in Middletown, New Jersey.

23. Plaintiff A.M. is a public high school student in Sparta, New Jersey.

24. All student plaintiffs with the exception of GABE McMAHON, who is over the age of 18, are minors participating as plaintiffs in this action with the consent and approval of their parent or guardian.

## DEFENDANTS

25. Defendant PHILIP D. MURPHY is the Governor of New Jersey, defendant ANGELICA ALLEN-McMILLAN, Ed.D, is the Commissioner of Education of New Jersey and defendant JUDITH M. PERSICHILLI, R.N., B.S.N., M.A. is the Commissioner of Health of New Jersey.

26. Defendants have the actual power and authority, or have asserted that they have such power or authority, to impose mandatory wearing of masks by children in New Jersey public schools and other Covid preventative measures imposed on schoolchildren, as described herein; in particular, defendant Murphy in his capacity as Governor of New Jersey issued Executive Order 251 mandating that all public and private schoolchildren, teachers and staff must wear masks in school and directing that all schools and district implement policies to mandate masking. *See* Executive Order 251, August 6, 2021, annexed hereto.

27. Defendants have supervisory power and authority over New Jersey public schools and school districts sufficient to block the implementation of such mandatory measures.

28.   Defendants have the legal power to implement and carry out an order of this Court that New Jersey public schools and school districts cease requirements of mandatory mask wearing by schoolchildren and other preventative Covid-related measures imposed on children, or any Covid testing without parental consent as asserted separately by Plaintiffs Kelly Ford and Ryan Cody (Count IV).   Defendants have the legal power to implement and carry out any order of this court enjoining or prohibiting said practices and their presence in this action will enable an effective remedy.

## **JURISDICTION**

29.   Jurisdiction is in the United States District Court pursuant to 28 U.S.C. §1331 in that this matter presents a federal question under 42 U.S.C. §1983, et seq., and the United States Constitution, based upon Defendants' assertion of powers under color of state law mandating the wearing of masks by schoolchildren and/or other Covid preventative measures, and requiring that school district issue such policies, thereby violating Plaintiffs' rights under the First, Fifth and Fourteenth Amendments to the Constitution.

## **VENUE**

30.   Venue is properly in the Newark Vicinage of the District Court of New Jersey based upon the residence of Plaintiff Cynthia Stepien in River Dale in the County of Bergen; the residence of Plaintiff Simona Chindea in the County of Essex; the residence of Plaintiff A.M. in Sparta, New Jersey in the Country of Sussex; the residence of plaintiffs J.V.P. and V.P. in Old Bridge Northern Middlesex County; the residence of plaintiff D.M. in Edison in Northern Middlesex County.

## COUNT I

**(Declaratory and Injunctive Relief as to Policies Mandating the Wearing of Masks by New Jersey Schoolchildren and Other Covid Preventative Measures While Attending New Jersey Public Schools)**

31.   Plaintiff repeats and reasserts each and every allegation set forth above as if more fully set forth herein.

### BACKGROUND TO THE EXECUTIVE ORDERS

32.   Following prior executive orders, New Jersey school districts where the student plaintiffs or the children of the parent plaintiffs attend school required through July 4, 2021 that all students attending public schools must wear face masks and be subject to other Covid-preventative measures while on the school grounds during the school day.

33.   Such requirements were based upon Executive Order No.175, §§2a-b, that required mandatory mask wearing, six foot social distancing and/or physical barriers between all New Jersey students, and Executive Order No. 242, §2 that exempted schools from the rescinding of mask mandates and other Covid-preventative measures in all other public and private places (except for health care and mass transit facilities).

34.   Executive Order No. 242 eliminated all masks, barriers and social distancing for children and adults at theaters, malls, retail establishments, restaurants, catering halls, athletic events and stadiums, political gatherings and public protests, public lectures, parks and beaches, houses of worship, weddings, bar and bat mitzvahs, communions, and other similar places of congregation, but children in New Jersey's public schools have continued to be made subject to mandates that they must wear face masks and engage in social distancing and other

isolating measures, including physical transparent barriers surrounding their desks, while in physical attendance at public schools.

35.  Under these policies and practices, schoolchildren who refuse to wear face masks have not been permitted on the premises of their schools or to participate in organized school activities and were required to remain at home for remote learning, losing the opportunity to associate with other students, teachers and staff.

36.  Exceptions to the school mask mandate and other requirements been given only on an ad hoc basis, and with no regulatory standard, for health or safety reasons particular to certain schoolchildren but are not available to the general student population including most plaintiffs; where such waivers may apply in certain instance they create a  stigmatizing effect since those schoolchildren with the waiver would be permitted to attend school without masking while all other children would be required to be masked; waivers also disclose to the general student and staff population that the given child has a medical condition and renders the waived child subject to fears that they may be communicating Covid or other conditions. Such waivers do not protect rights but enhance injury from masking and other Covid preventative measures.

37.  Governor Murphy and Commissioner of Education Angelica Allen-Mcmillan announced June 28, 2021 that Executive Order 175 will be allowed to expire on July 4, 2021 but that school districts were authorized to continue mask mandates and other Covid restrictions in their discretion.[1]  In their announcement, Defendants Murphy and Allen-

---

[1] See e.g. https://www.nj.com/?
e=dbf55eea75c4e425a5e5f74c2f687d0e&utm_source=Sailthru&utm_medium=email&ut
m_campaign=Newsletter_coronavirus&utm_term=Newsletter_coronavirus

McMillan specifically stated that school districts were empowered and authorized to continue social distancing and physical separation between students; the Governor expressly reserved for himself the power to reimpose mask mandates and other restrictions via executive order. Such statements also appear in the state's document entitled "The Road Forward" published June 29, 2021 at https://www.nj.gov/education/roadforward/docs/HealthAndSafetyGuidanceSY2122.pdf.

38.  Subsequently, on August 6, 2021 the Governor announced and issued Executive Order 251 that provided that all New Jersey school districts maintain mandatory masking policies for all schoolchildren, teachers and other staff subject to certain narrow exceptions. See Executive Order 251. Specifically, the Executive Order states as the basis for the mandatory masking policy that

> "the State has experienced significant upticks in critical COVID-19 metrics over the past few weeks, including COVID-19 positive cases, the rate of transmission, spot positivity, and new hospitalizations, that warrant additional precautions in certain settings with a substantial number of unvaccinated individuals;"

See Executive Order 251 at 3-4.

39.  The Governor has asserted that all schools, public and private, must adhere to the provisions of Executive Order 251.

40.  Executive Order 253 reaffirmed Executive Order 251 and also stated that any exemptions to student mask wearing should be limited as much as possible to "maximize" mask wearing.

41.  Accordingly, a justiciable controversy exists under the Declaratory Judgment Act, 28 U.S.C. §2201 as to whether defendants are acting, under color of state law, or have assumed the power, to authorize and facilitate mask mandates and other preventative and

restrictive measures imposed on schoolchildren, burdening, restricting and limiting rights of speech, communication, association and privacy protected by the First, Fifth and Fourteenth Amendments to the United States Constitution, giving rise to a right of declaratory and injunctive relief pursuant to 28 U.S.C. §1983, et seq.

### MASK-WEARING MANDATES AND OTHER COVID-PREVENTION MANDATES BURDEN AND IMPAIR THE PROTECTED SPEECH, ASSOCIATIONAL AND PRIVACY RIGHTS OF CHILDREN

#### Associational Impairment and the Chilling Effect of Masking

42. Mandatory wearing of masks by schoolchildren burdens and impairs protected speech rights, inhibiting and preventing communication between students, and between students, teachers and aides.

43. Mandatory mask wearing prevents or impairs the perception and exchange of non-verbal forms of communication vital and material to the exchange of ideas, thoughts and emotions.

44. Mandatory wearing of masks burdens and impairs protected associational rights of schoolchildren, inhibiting and preventing the formation and maintenance of relationships and friendships between schoolchildren, and between schoolchildren and teachers and staff.

45. Masking prevents non-verbal exchanges of information and signaling through facial cues and gestures of emotion, humor, approval and disapproval, joy, anger or despair, encouragement or discouragement of friendship and other non-verbal forms of communication.

46. Such non-verbal communication is:

a) necessary and material to normal human associational rights and interests;

9

b) a critical and non-severable part of human speech and association; and

c) necessary and material to normal exchanges of ideas and thoughts.

47.   Schoolchildren, like all human beings, require access to facial expressions and non-verbal cues as a normal and assumed part of human association; the deprivation of such by mandatory mask wearing impairs their liberty and privacy interests.

48.   Mandatory mask usage chills, prevents and inhibits basic communication. Words are frequently muffled and rendered inaudible by the use of masks; students are chilled in their willingness to communicate or express themselves by the barrier presented by face coverings; students are chilled in exercising their speech rights, in part, because masking prevents the feedback of acceptance, disagreement and other non-verbal cues that complete human thought and communication; plaintiffs have had difficulty understanding teachers or each other due to mask usage and have refrained from speech in class due to such constraints.

### Non-Masking Elements of the Executive Orders

49.   In prior executive orders, the Governor has imposed other restrictive measures including the use of plexiglass barriers surrounding school desks, social distancing and isolation measures that burden and prevent ordinary communication and association; such measures prevent, impair and burden speech, privacy and associational rights of schoolchildren.

50.   As an example of such practices, Plaintiff Ryan Cody observed his son's kindergarten desk surrounded by plexiglass barriers on May 20, 2021 when he toured his son J.C.'s classroom; Mr. Cody has been told that such conditions will continue to be imposed in September 2021 when his son's school resumes.

51.  By way of further example, the eight-year old daughter of Plaintiff Stamatia Dimatos Schreck, residing in Mahwah and attending the Mahweh School District was forced in the 2021 spring term to sit in her classroom surrounded by plexiglass barriers and was subjected to imposed social distancing measures, along with mask wearing.

52.  Beginning May 5, 2021, Plaintiff Cynthia Stepien's eight-year old daughter I.B., age 7, a second grader at Woodside Elementary School in River Vale, New Jersey, was forced to sit at her classroom desk surround by plexiglass barriers and became subject to imposed six foot social distance barriers between all students and teachers and staff; her class was told by her teacher at Woodside to imagine a tight circle around her desk as the only space where students could stand.

53.  Upon information and belief, such policies were universal in New Jersey schools through at least July 4, 2021 and were mandated in the Department of Education's "The Road Back" that states:

> "In a classroom setting where social distancing can take place (e.g., desks are 6 feet apart) or physical barriers are in place, face coverings can be removed when students are seated at desks but should be worn when moving about the classroom."

https://www.nj.gov/education/reopening/NJDOETheRoadBack.pdf at 19.  "The Road Back" also provides that "face coverings are always required for visitors and staff…". *Id.*

54.  The Road Back mandates six foot separation between all students at all times:

> "[S]tudent desks and seating in classrooms, cafeterias, multi-purpose rooms, and other spaces should be separated by at least six feet to the maximum extent practicable. Where such physical distancing is not feasible or difficult to maintain, protective measures such as physical barriers between students and arranging seating such that all individuals face the same direction can help reduce transmission."

https://www.nj.gov/education/reopening/NJDOETheRoadBack.pdf at 18.

55.   Other mandates of the Department of Education included forced separation of children during meals and recess periods, prohibiting children's desks from facing each other, requiring children to sit on only one side of a table spaced six feet apart.  *Id*. at 18-19.

56.   The requirements intentionally bar mixing of classes or cohorts, further burdening associational and privacy rights of children.  *Id.* at 31.

57.   Summaries of the experience of certain named plaintiffs in the wearing of masks and Covid separation mandates appear below at ¶¶57-71, *infra*.

**Plaintiff K.B.'s Experience Under Covid Masking and Separation Mandates**

58.   Plaintiff K.B. has experienced a direct intrusion into her associational rights.  For example, at lunchtime her associational opportunities were limited by the Covid regulations to two students at opposite ends of a lunch table (with three students in the case of a larger oval table); previously she could choose to associate at will with a group of 10 students or more at a single lunch table with the students forming their own group but such choices and opportunity to associate and communicate with other students were prohibited under the Covid regulations; such communal gathering at lunchtime was a vital part of K.B.'s school experience and formed a traditional and important forum for student communication and association.

59.   Under the mask mandate K.B. lost the ability to relate emotionally to other students; she is prevented by mask usage from helping other students with their emotions and feelings as she has done in the past because she cannot see their expressions based on facial movement and signaling.  Wearing a mask, she can no longer tell if her colleagues in a classroom group are seeking help, if they are confused with a project, if they are mad, if they

wish to be left alone, all materials elements of her ordinary communication and associational acts that are lost to her under the Covid regulations.

60.  Due to the loss of non-verbal cues and signaling, K.B. no longer knows if friends or other students are glad to see her and wish to communicate with her or if they are angry, irritated and not willing to communicate or, conversely, if they welcome her presence.  She has lost the emotional component of communication and association.

61.  K.B. also experiences a severe intrusion into her emotional well-being as she finds herself criticized and chastised if she slips her mask below her nose.  She finds that she is now in an anxious state throughout the school day due to the fear of such criticism and of teacher discipline; she did not experience this fear in school prior to the mask mandate.

62.  K.B. is no longer comfortable in her relations with teachers due to the fear of constant mask discipline.  She further believes that friends will seek to avoid her if she wears her mask below her nose as she often does due to her asthmatic condition.

63.  K.B. experiences discomfort and claustrophobia wearing the mask due to her asthma and difficulty breathing.  K.B. now experiences regular and repeated panic attacks caused by the day long sensation of smothering while wearing a mask and has changed her behaviors at home due to such anxiety: for example, she no longer sleeps with a blanket over her head at night due to her day-time perception of smothering; her allergies have worsened and she has significant self-esteem issues due to her feeling of isolation in her opposition to the use of the mask in school.

**Plaintiff B.W.'s Experience Under Covid Masking and Other Separation Mandates**

64.   Plaintiff B.W. is a junior at a high school in Monmouth County.  She experienced nearly a full year of mask mandates and other separation regimens as she was attending a special course that required in-person presence.

65.   By means of the mask mandates and separation regimen, she lost her social center as her friendships and associations arise as a result of her attendance at school; during the period when students returned to schools in large numbers and were masked and separated in May and June, B.W. was unable to develop new friendships or personal associations due to the inability to see faces and the requirement of maintaining a strict six foot separation.

66.   Continuing discipline by teachers for violation of these standards also interfered with the development of and maintenance of her friendships and associations.

67.   B.W. had difficulty in making friendships due to the inability to get to know others due to the mask and separation mandates; in her experience, friends frequently and repeatedly said they did not recognize each other, adversely impairing social interactions. B.W. has forgotten many students and frequently will not begin conversations as she cannot see the face of other persons.  Lacking access to facial expressions B.W. is confused about the emotional reactions and responses of others.

68.   For B.W., like most people and other plaintiffs, facial expression is fundamental to communication and association especially because B.W.'s first fourteen (14) years were lived free of such impairment and burden; prior to the mask mandate she was able to access non-verbal social cues that are absent under the mask regimen. The absence of facial expressions and other social cues due to mask usage now forces B.W. to learn over again

methods of understanding of others' emotional states; her prior 14 years experience with non-verbal means of understanding and communication is now beyond her reach under mask mandates.

69.  Mask mandates have caused B.W. to suffer harm and interference in her functioning as an individual.  B.W. has repeatedly had contact lenses rip due to the air that flows into her eyes from under the mask that dries out the lenses and causes them to tear, a condition she never experienced in her school years prior to mask mandates; under the mask mandate B.W. has suffered an impairment of her self-esteem and no longer cares for her appearance in preparing to go to school each day and she does not look forward to school now that its social aspect has been impaired.  B.W.'s enjoyment of life has been injured materially due to the continued discipline imposed by teachers as to mask usage.

70.  B.W. experienced extreme limitations in lunchtime association with other students due to the mask and separation mandates: at lunch, students were isolated in the gymnasium on separate desks kept apart from each other or, on some occasions, forced to sit no more than two people at a single table six feet apart and, if a larger table, three persons; this was a material and adverse change from the usual and traditional lunchtime cafeteria practices typically experienced by B.W. in which unlimited numbers of students could choose to associate together at lunch tables, generally at least 10 students with open and unrestrained communication.

71.  B.W. ceased to speak to or associate with other students during lunch periods due to the impairment described herein.  For B.W. and other students at New Jersey public schools, particularly middle and high school students, the lunch period is vital to their speech

and associational interests: lunch is traditionally a period when students are not in class and do not have direct obligations to adhere to a structured order of activity.  At lunchtime students are free, by long tradition and practice, to engage in open communication and association with other students. Such traditional association and communication during lunch is impossible under the mask and separation mandates as there is no direct proximity between students for ordinary conversation, they are kept isolated at separate desks or tables and all discussion must take place over a distance between desks or tables; such "communication" necessarily loses any element of privacy or confidentiality as it must be sufficiently audible to traverse the distance between desks or tables and be heard by others; the intimacy of direct, private communication with other students is lost under the mask and separation mandates, comprising a substantial impairment of speech, associational and privacy rights.  B.W. along with other plaintiffs and students throughout the state has experienced a material interference and impairment of her associational and privacy rights during the traditional lunch period.

**Plaintiff M.K.N.'s Experience Under Covid Masking and Other Separation Mandates**

72. Plaintiff M.K.N. will be a junior at Jackson High School in Jackson, New Jersey. For M.K.N. school was a central place of social contact and interaction where she would see all of her friends in one place, engage in group projects, interact with her teachers, and spend her day with peers who were the same age. Upon her return to school, following the onset of the mask and separation mandate, M.K.N. developed a feeling of hate towards attending school; she was impaired in her ordinary and usual association with fellow students since all had to be distanced and masked making it difficult to make personal connection.  M.K.N. was not able to communicate with teachers or other students in the usual and ordinary manner

because they were muffled behind their masks. Once extremely motivated as a student, following the onset of mask and separation mandates M.K.N. found it hard to want to do her work most of which was now independent because masks made it hard for teachers to be able to lecture for long periods of time. Masks contributed to M.K.N.'s insecurities and lowered self esteem, in part, because she developed an increased facial acne following the stress of the mask and separation mandates.

73.  M.K.N. also felt forced to abandon her vocation as a track athlete because practicing and working out with a mask made her physically uncomfortable; she did not feel it was safe to undergo practice in a mask and to wear a mask during a large portion of meets, demands that impaired her ability to practice and compete. In the prior winter season, athletes were required to remain masked when outside at all times when not actually competing. Track was a large and important social aspect of M.K.N.'s school life and she felt compelled to give it up because of the mask requirement. The loss of such a major social aspect of M.K.N.'s school life affected her ability to learn and to interact with peers, impacting her mental health and sense of well-being; she is dreading the return to school in the fall.

## Plaintiff M.F.'s Experience Under Covid Masking and Other Separation Mandates

74.  Plaintiff M.F. will be a senior in September at Barnegat High School in Ocean County, New Jersey.  He has not set foot in school since the mask mandate began.  As a person with Asperger's Syndrome, M.F. bases his communication heavily on people's expressions and emotions. M.F. needs to see what people feel before he speaks; when he can't see their expressions, he struggles to communicate.  When M.F. cannot see a frown or a smile he does

not understand how the speaker is speaking or understands fully the message because he needs access to their expressions to infer meaning.

75.   Ordinarily, M.F. has no trouble socializing but cannot when others are wearing masks because he can't communicate with them as they are emotionless as far as he can see. Masking impairs M.F.'s ability to develop friendships and relationships.  He has other friends who have stayed out junior year.  The masking rule, by compelling students to remain out of school, has the effect of impairing and impugning their associational rights and interests.

76.   M.F. also has epilepsy and finds a mask makes breathing difficult; his seizures are brought about primarily by high temperatures and heat; masks cause him quick fatigue, difficulty in breathing and heat builds up that leads to his seizures; he reasonably fears based on his own experience that seizures will arise if he is forced to attend school wearing a mask.

77.   Even if a medical waiver is available for M.F. to attend school without a mask, he will be a lone exception among the vast majority of students,  As such, a waiver is not a remedy for M.F. as it will have the effect of stigmatizing him, communicating to students and staff that he has an illness that others lack, violating his health privacy, and conveying the appearance that he is a threat of communicating a disease since he would be without a mask.

### Plaintiff A.F.'s Experience Under Covid Masking and Other Separation Mandates

78.   Plaintiff A.F. will be a sophomore at Barnegat High School.  She began her career at Barnegat High in September 2020 as a freshman under a Covid mask and separation regimen.  A.F. frequently left class to go to the bathroom to remove her mask so she could breathe freely and easily, thereby forced by the mask requirement to leave class and its learning opportunities.  She was anxious and feeling trapped at school as a result of mandatory

mask usage.  A.F. found it hard to recognize people who were wearing masks and sitting

surrounded by plexiglass around their desks.  To avoid these impairments A.F. was forced

after two weeks to accept virtual or remote learning but even then she could still not see the

teacher's face (or other students) who were all masked and surrounded by plexiglass.

79.  In person or virtually, A.F. could not see or identify individual students who were

masked and could not adequately understand teachers or fellow students because masks and

plexiglass barriers impaired communication. While they were masked A.F. experienced that

fellow students were unwilling to ask questions of teachers as they normally would during

during a lesson.  A.F. experienced for herself, and observed for others, fear and anxiety that

removing the mask during school would be seen as harming someone; she also felt that she

would be seen by others as lacking compassion if she removed her mask or adjusted it off her

nose, factors that contributed to her anxiety.  She began counseling as a result of these issues.

### Plaintiff Schreck Child's Experience Under Covid Masking and Other Separation Mandates

80.  Stamatia Dimatos Schreck's eight year old child attends school in the Mahwah

school district and is highly dependent on her emotional connection with peers and teachers.

She has told plaintiff Schreck that she cannot communicate with her teacher or her friends

because of the mandatory mask.  Teachers and other students could not hear her voice because

of her mask; plexiglass surrounding her desk interfered with hearing or talking with her

teacher or other students.

81.  Plaintiff Schreck's child complains that she cannot breathe throughout the entire

school day and is afraid to ask her teachers if she can pull her mask below her nose

periodically, to take a breath for a moment. Snack time is the only time this eight year old can

pull down her mask, a period that is limited to a few minutes; she has shortness of breath and dizziness while wearing the mask.

### Plaintiff A.M.'s Experience Under Covid Masking and Other Separation Mandates

82.   After spring break in late April to late June, A.M. began going to school full time and wore masks all of the time, from 7:20 A.M. to 2:20 P.M. each day.  She had no breaks with the mask except for lunch and would typically go 3-4 hours wearing the mask with no break. For A.M. school was a lot less personal wearing masks in school; she reports that it feels like we are doing something wrong by showing our faces by pulling our masks down to get a drink or to breathe. While wearing a mask A.M. could not breathe freely throughout the day; for her, masks are extremely uncomfortable.

83.   Plexiglass was folded on each desk in A.M.'s high school classrooms; students had to unfold the plexiglass and plane it around the outside of the desk, three sides, each time they came into a room.

84.   In hallways in A.M.'s school, a rule was instituted that students could only walk on one side of the hallway. A.M. reports feeling controlled.  She reports that walking down the hallway and seeing everyone in masks made school feel like a hospital; she reports thinking to herself, "this is school and shouldn't feel this way".  A.M. reports minimal conversation in the halls while students are masked and that in the pre-pandemic period the hallways used to be loud with people always laughing but that after the masks were mandated she never really saw that conduct any longer.

85. Indoors A.M.s school required that students eat with hundreds of plexiglass shields on tables. Not more than three people were at each table, each surrounded by plexiglass. A.M. reports that students could still talk to each other at the table but it was an abnormal setting in that students were used to talking freely to one another and now were unable to.

86.   A.M. reports that forced masking and the plexiglass made students feel that each was sick and contagious and had some deadly disease to be protected against.  She could not understand the logistics behind the virus measures that made her feel guilty, as if she had done something wrong; she

reports that the masks and plexiglass felt like punishment that is ruining her teenage years and her high school experience. She reports that high school under these regimes seems like imprisonment because her freedoms are being taken away.

87.  For A.M. the masking regime and plexiglass made her school experience lose its personal aspects. She found that she could not speak to her friend or neighbor without plastic between them; she reports that the environment was no longer a welcoming school setting.  She also reports that physically speech was impaired as it is much more difficult to hear others because the masks cover faces, creating a situation that is not normal; she is used to being around fellow students with no boundaries. She believes that she converses less than usual because of the masks and plexiglass. For A.M., she no longer looks forward to school nor does she enjoy the school setting due to these restraints and the imposition on access to and conversation with friends and school colleagues.

88.  A.M. also reports that continued mask discipline and disciplinary threats by teachers in which students are chastised multiple times each day to wear or pull up their mask or to keep their plexiglass in place has impaired her relations with her teachers who she formally regarded as friends but now considers to be alienated from her.  She reports that teachers had encouraged her and others to regard them as students' friends and that their offices and classrooms were "safe spaces". A.M. says that she no longer regards teachers in this way due to the discipline and chastisement in the masking regimen.

### Non-Plaintiff Robert Wilbur's Experience Under Covid Masking and Other Separation Mandates

89.  Robert Wilbur, a senior who graduated in spring 2021 from Howell High School, Farmingdale, and is not a plaintiff as he is no longer in the school system.

90.  He experienced a loss of personal and human connection while wearing a mask in that the face is not visible except for the eyes; the mask prevented him from experiencing a humanized relationship and real interaction with other people at school; he experienced a loss when students and staff could no longer present themselves in a friendly manner causing an

interference in his human connection with them; Wilbur experienced what he describes as a "scary" scenario when students with masks could not be differentiated by teachers taking away their distinctness of being an individual human being.

91.   Robert Wilbur experienced a material loss of association with the school community at joint school events, such as films or other activities, in that masked audiences and crowds prevent viewing or identification of friends since one simply sees people wearing masks without the ability to see and judge reactions and feelings; he experienced a robotic sense with others when masked, not normal human interactions.

92.   The quality and nature of his interactions at school under the mask mandate were impaired materially when, for example, he received a track award and shook hands with his coaches and school officials but could see no facial expressions of pleasure, smiles, warmth or any other reaction, depriving him of any sense of worth in the award due to the lack of validation, a primary reason for engaging in school activities.  At the end of his student career, Robert Wilbur sought such validation and was deprived of it along with a sense of belonging. During the mask mandate, he could not increase his circle of friends and associates, particularly because the use of masks and separation orders made interaction with others difficult if not impossible, a material intrusion into his liberty and privacy interests.

93.  High school was vital to Robert Wilbur's associational interests.  He ranks high school as highest among the places where he would meet with people, develop friendships and communicate with people, particularly, the lunch period that he ranks highest among all locations where he would pursue associational and speech interests.  The lunch period was the time when students were free to walk around, when one would see everyone, even people one

did not have classes with. Before Covid the lunch period was the "epicenter" of students' associational interests and was a time when everyone was sort of let loose. In Robert Wilbur's high school experience, everyone was eating lunch at the same time; the cafeteria could not accommodate everyone so students could also go to the main gym, secondary gym and two wings of classrooms were available. He describes the pre-Covid lunch period as typically very open and free and central to his and other students' associational interests.

### Masking Mandates Intrude Upon A Child's Associational Interests and Other First Amendment Rights and Interests

94.  Masking and other Covid preventative practices as described in this Second Amended Complaint are common throughout New Jersey's public schools based upon the experiences of the plaintiffs and based upon the directive and mandate of the Governor and the New Jersey Department of Education that claims it imposed such requirements statewide pursuant to N.J.S.A. 18A:40-6 and N.J.A.C. 6A:16-2.1.  *See* The Road Back,  https://www.nj.gov/education/reopening/NJDOETheRoadBack.pdf  at 16.

95.  The school is a fundamental center of a child's associational rights and interests, and is their primary forum for meeting people, communicating, speaking on matters of common interest, ordinary social and human intercourse and developing social contacts and friendships.

96.  Such rights are constrained and impaired when children are masked and kept isolated and segregated from one another.

97.  Such targeted intrusion into personal rights and liberties of children is particularly egregious when the state has removed all such restraints on all other members of the population and in all other places of public assembly.

23

98.  Within the school itself, the traditional freedoms of the lunch period, a place of relaxed discipline and structure where students engage in free and open conversation and pursuit of personal associative relationships, has been restricted and restrained in material ways under the state's masking and/or other Covid regulations.

99.  In other ways, the state has imposed restrictions on the ordinary and usual socialization and associational relationships between schoolchildren.

100.  For example, schoolchildren are regularly chastised by teachers, often multiple times per day, if their masks slip below their nose or if masks are not adjusted properly or if the child removes the mask; children are regularly and routinely threatened with disciplinary write-ups if they do not adjust their masks to a "correct" usage.

101.  Anxiety in schoolchildren caused by such continuing chastisement violates the privacy rights of children and burdens and inhibits the exercise of children's speech and associational rights.

102.  Discipline over the use of masks is a new element in the state's educational program that has changed the relationship between students, and between students and teachers, injects anxiety in the student-teacher relationship, violating the right of privacy and association of the plaintiffs and their children.

103.  Mandatory use of plexiglass dividers surrounding each individual student's desk confines and imprisons children, separates them from their friends and teachers and introduces an unnatural form of control and segregation upon children in the classroom, further violating the liberty and privacy interests of plaintiffs and their children.

104.  The practice of masking, as well as other practices described above, are elements introduced into the public schools that have not been examined or studied as to their potential harmful impacts among children; that interfere in their ability to communicate; that impose an unnatural lifestyle upon children; and interfere with their association with friends, other students and teachers; such practices cause alienation and anxiety among students.

105.  The process of mandatory mask wearing causes anxiety to plaintiffs and others as a direct by-product of school attendance.

106.  Masks are worn all day, giving rise to a continuing regimen of mask discipline; masks become wet with saliva, causing discomfort and interfering with a school child's ordinary comfort and function

107.   Students regularly have difficulty breathing causing many to move the mask below the nose only to be disciplined by school staff until they correct the mask placement. These conditions are regularly experienced by students under the mask mandates.

108.  Mandatory wearing of masks on a continuing full time basis is contrary to the normal and natural functioning of the human body and a violation of the right of the citizen to control their body and their natural functions.

109.  The unnatural forced covering of a part of the children's body, their face, that is normally exposed in ordinary social intercourse and that represents the primary means of personal identification and reflects the basic individuality of the child violates children's rights of privacy

110.  Parent plaintiffs have not consented to the imposition of these unnatural conditions upon their children, violating their associational and privacy interests.

111.  The Covid masking regimen imposed in New Jersey schools permits no ordinary conversation and chills discussion or communication between students; the mask and separation mandates impair ordinary human discourse, conversation, non-verbal communication and signaling through facial expressions.

112.  Such mandates chill and impair expression and communication due to the unnatural constraints imposed on the children's social intercourse.

113.  Throughout New Jersey, schoolchildren are given two mask breaks per day for a short duration but must otherwise wear masks at all times with the exception of outside gym class or, in some instances, when they are permitted to remove masks while seated inside their plexiglass dividers surrounding their desks.

114.  All such measures impair and burden speech, association and privacy rights of children in the public schools.

WHEREFORE, plaintiffs seek judgment as follows:

1) Declaratory relief that the policy and/or practice of mandating the wearing of masks by schoolchildren in New Jersey public schools violates children's protected speech, privacy and associational rights and interests;

2) Declaratory relief that other purportedly preventative and disciplinary measures as described herein violate students' speech, associational and privacy rights;

3)  Injunctive relief directing that defendants cease such practices and affirmatively order the withdrawal by school districts of all such orders, guidelines and policies and directing that school districts and officials shall not issue or implement such orders;

4) Declaratory relief that Executive Order 251 and No. 253, inasmuch as it ratifies or affirms Order No. 251, are void as illegal and violate the First Amendment rights of New Jersey schoolchildren;

5)  Injunctive relief barring the State from enforcing Executive Order 251 and 253 and vacating such order;

6)  Reasonable attorney's fees and cost of suit and such other relief as to the Court should seem just and proper.

## COUNT II
### (Due Process — Substantive and Procedural)

115.   Plaintiffs repeats and reasserts each and every allegation set forth above as if more fully set forth herein.

### NO PUBLIC PROCESS OR HEARINGS AS TO THE EXECUTIVE ORDERS

116.  No public process pursuant to the New Jersey Administrative Procedure Act, N.J.S.A. §52:14B-2, et seq. (hereafter the "APA"), or otherwise, has taken place prior to the imposition of mask mandates or other Covid preventative measures as to New Jersey schoolchildren.

117.  Defendants, in their capacity as officers of New Jersey, have held no public hearing, either with or without notice, prior to the imposition of mask mandates or other Covid preventative measures governing New Jersey schoolchildren.

### NO STUDY AS TO EFFECTS OF MASKING OF CHILDREN

118.  Defendants have not studied or examined the impact of the state's Covid regimen on schoolchildren or released or identified such studies.

119.  Defendants have held no hearings to evaluate such measures on the development or psychology of children.

120.  No public comment or testimony has been solicited or permitted from lay witnesses or experts as to such impacts; no evaluation has taken place or been released as to the effect of such measures on children; no adequate or substantiated findings of fact have

been issued by defendants through any agency identifying the basis for the mask mandate or

other Covid separation regimens as to New Jersey schoolchildren.

### NO RECORD HAS BEEN RELEASED AS TO THE BASIS OF THE EXECUTIVE ORDERS AND NO ADEQUATE FINDINGS HAVE BEEN MADE TO SUBSTANTIATE THE ORDERS' MANDATORY MASKING SCHOOLCHILDREN

121.  No record has been released by the Governor or other defendants that can be

examined by a court, the legislature or the public as to the basis for the issuance of Executive

Orders 251 and 253.

122.  To the extent any executive order purports to set out findings of fact, such

findings did not come about through any public process on notice with the right of public

participation in a public hearing, as required under the APA.

123.  To the extent the defendants contend that Executive Orders 251 and 253 contain

findings of fact, no substantiated findings have been presented to support the issuance of the

Executive Orders as to masking schoolchildren.

124. To the extent defendants contend they have the power to unilaterally impose

such measures upon New Jersey Schoolchildren or to authorize school districts to impose such

measures, any such assertion of power violates the substantive and procedural due process

rights of parents and children, thereby depriving plaintiffs of due process under the Fifth

Amendment to the United States Constitution.

125.  Defendants have not identified any persons they have consulted or relied upon

in the issuance or determination of mask mandates or other Covid preventive measures as to

New Jersey schoolchildren; defendant's circle of consultants and other contributing public

officials to the issuance of such orders is kept private and non-transparent, a further violation of planitiffs' and the public's due process rights.

126.  As set forth in connection with Count I above, the masking and other Covid preventative measures violate the protected liberty interests of New Jersey schoolchildren and their parents.

## EXECUTIVE ORDER 251 IS ARBITRARY, CAPRICIOUS, UNREASONABLE OR ILLEGAL

127.  Executive Order 251 is indefinite and of continuing duration without stipulated end and provides for arbitrarily adding more restraints of a completely unknown nature by the unilateral order by the Superintendent of the State Police, as section "3" of the Executive Order states:

> The State Director of Emergency Management, who is the Superintendent of State Police, *shall have the discretion to make additions, amendments*, clarifications, exceptions, and exclusions *to the terms of this Order*.

Executive Order 251 at §3 [emphasis added].  Thus, Executive Order 251 allows an unknown and unaccountable official, the head of the state police, to make additions and changes *at will and in his own discretion*.

128.  In addition, no objective criteria have been established by the State or by the defendants for the imposition of masking or other Covid mandates on children or for the termination of such orders.

129.  The Executive Order's reference to "significant upticks" in Covid "metrics" is an arbitrary basis on which to impose restraints on residents of the State.

130.  Due to the foregoing concerns, the executive orders and any other orders or directives by any official of the state or any school district imposing mask mandates or other Covid preventative measures imposed upon New Jersey schoolchildren violate plaintiffs' rights to due process, both substantive and procedural.

WHEREFORE, plaintiff respectfully seeks judgment pursuant to 28 U.S.C. §1983 and/or directly under the Fifth and 14th Amendments, as follows:

1) declaratory relief that the mask mandate and other Covid-preventative measures that have been imposed on New Jersey Schoolchildren, and as are to be re-imposed, and Executive Orders 251 and 253, violate plaintiffs' rights to substantive and procedural due process pursuant to the Fifth and 14th Amendments to the United States Constitution and relief, in particular, vacating Executive Order 251;

2) injunctive relief barring the re-imposition of mask mandates and other Covid-preventative measures as to New Jersey schoolchildren by any state agency or by any school district or public school in the absence of hearings on notice pursuant to the APA and other forms of appropriate due process;

3) injunctive relief affirmatively directing defendants to issue orders vacating and rescinding all such mandates and orders by any agency or instrumentality of the State of New Jersey including but not limited to any public school, school district or board or any school agency, and directing that school districts and officials shall not issue or implement such orders;

4) reasonable attorney's fees, interest, costs and such other relief as to the Court seems just and proper.

## COUNT III
### (Equal Protection)

131.  Plaintiff repeats and reasserts each and every allegation set forth above as if more fully set forth herein.

132.  The executive orders mandating mask wearing in all public places by persons living in or situated in New Jersey and other isolating measures have been rescinded either by operation of law or by the Governor's action pursuant to Executive Order No. 242.

133.  Other than children in school, people situated in New Jersey are no longer required by any law, regulation or executive order to wear masks in public places, to practice social distancing or to be kept within barriers while inside indoor structures such as businesses, theaters, restaurants, bars, places of worship, stadiums, or any other similar place of public congregation (except for health care and mass transit facilities).

134.  Regardless of vaccination status, adults and children may sit in close packed rows at an indoor stadium; at a movie theater; in restaurants and bars; in houses of worships; may dance in large groups at weddings or other gatherings; may mass at political meetings or protests; may sit close together at public entity meetings such as planning and local governing bodies or at lectures or at indoor theaters or playhouses; may mix and sit freely in libraries and a host of other locations in any degree of proximity or for any length of time without mask or separation requirements.

135.  New Jersey schoolchildren and teachers and staff, however, are still subject to mandatory masking and other restrictive measures by virtue of Executive Orders 251 and 253.

136.  By virtue of the foregoing, Executive Orders 251 and 253 mandating mask wearing by schoolchildren impose a burden on children (and teachers and staff) that is distinct and separate from any burden imposed on other persons or classes of persons in similar places of public or private congregation thereby violating the equal protection clause of the 14th Amendment to the United States Constitution.

137.  In addition, the mask mandate and other Covid preventative measures as to New Jersey schoolchildren, including but not limited to Executive Orders 251 and 253, also violate the equal protection clause of the New Jersey Constitution (1947), thereby depriving plaintiffs of their right to due process under the Fifth Amendment to the United States Constitution.

WHEREFORE, plaintiffs respectfully seeks judgment pursuant to 28 U.S.C. §1983 and/or directly under the Fifth and 14th Amendments, as follows:

1) declaratory relief that the mask mandate and/or other Covid-preventative measures, including but not limited to Executive Orders 251 and 253, violate plaintiffs' rights to equal protection under the 14th Amendment;

2) declaratory relief that the mask mandate and other Covid-preventative measures described herein, including but not limited to Executive Orders 251 and 253, violate plaintiffs' rights to due process pursuant to the Fifth Amendment based upon the violation of the New Jersey Constitution's equal protection provisions;

3) injunctive relief barring the mask mandate and its implementation and other Covid-preventative measures as to schoolchildren by any state agency or by any school district or public school, including but not limited to Executive Orders 251 and 253;

4) injunctive relief affirmatively directing defendants to issue orders vacating and rescinding all such mandates and orders by any agency or instrumentality of the State of New Jersey including but not limited to any public school, school district or board or any school agency, and directing that school districts and officials shall not issue or implement such orders;

5) reasonable attorney's fees, interest, costs and such other relief as to the Court seems just and proper.

## COUNT IV
### (Covid Testing of Schoolchildren - Plaintiffs Ryan Cody and Kelly Ford)

138.  Plaintiffs Ryan Cody and Kelly Ford repeat and reassert each and every allegation set forth above as if more fully set forth herein.

139.  Based upon the guidance set forth in "The Road Forward" and other public statements by the Governor and the Commissioner of Education, school districts and officials have been authorized to impose any Covid prevention measure in their judgment including testing of schoolchildren in school.

140.  Such mandatory testing of schoolchildren is typically by nasal swab that is invasive and in many cases causes injury, pain and anxiety depending on the individual child's physiology and sensitivity and on the manner of administration of the test by the provider.

141.  Schools are not empowered by law to administer medical treatment, testing or therapy of students without parental consent.

142.  Because the Governor and Commissioner's guidance does not limit the scope of authority to test students to instances where the school obtains parental consent, a justiciable question arises as to whether school districts and officials have been authorized to administer Covid tests to children without parental consent.

143.  Accordingly, plaintiffs Ryan Cody and Kelly Ford, on behalf of themselves and others similarly situated, seek relief as follows:

1) declaratory relief pursuant to 42 U.S.C. §1983, that Covid testing of children by school districts and their officials without parental consent violates the plaintiffs' due process rights to govern the health care of their children and their privacy

rights to act as parents to supervise and determine the medical treatment, testing or therapy to be provided for their children;

2)  injunctive relief barring Covid testing of schoolchildren by any school district or school official without express, written parental consent;

3)  injunctive relief affirmatively directing defendants to issue orders to New Jersey school districts directing that they shall not conduct Covid testing of any schoolchildren in the absence of express, written consent by their parent or guardian;

4)  reasonable attorney's fees, interest, costs and such other relief as to the Court seems just and proper.

Dated: August 27, 2021.

Respectfully submitted,

Bruce I. Afran,
Counsel for Plaintiffs

**EXECUTIVE ORDER NO. 251**

WHEREAS, on March 9, 2020, I issued Executive Order No. 103, declaring the existence of a Public Health Emergency, pursuant to the Emergency Health Powers Act("EHPA"), N.J.S.A. 26:13-1 et seq., and a State of Emergency, pursuant to the New Jersey Civilian Defense and Disaster Control Act ("Disaster Control Act") N.J.S.A. App A:9-33 et seq., in the State of New Jersey for Coronavirus disease 2019 ("COVID-19"); and

WHEREAS, through Executive Order Nos. 119, 138, 151, 162, 171, 180, 186, 191, 200, 210, 215, 222, 231, 235, and 240, issued on April 7, 2020, May 6, 2020, June 4, 2020, July 2, 2020, August 1, 2020, August 27, 2020, September 25, 2020, October 24, 2020, November 22, 2020, December 21, 2020, January 19, 2021, February 17, 2021, March 17, 2021, April 15, 2021, and May 14, 2021, respectively, the facts and circumstances of which are adopted by reference herein, I declared that the COVID-19 Public Health Emergency continued to exist and declared that all Executive Orders and Administrative Orders adopted in whole or in part in response to the COVID-19 Public Health Emergency remained in full force and effect; and

WHEREAS, in accordance with N.J.S.A. App. A:9-34 and -51, I reserve the right to utilize and employ all available resources of State government to protect against the emergency created by COVID-19; and

WHEREAS, as COVID-19 continued to spread across New Jersey, I have issued a series of Executive Orders pursuant to my authority under the Disaster Control Act and the EHPA, to protect the public health, safety, and welfare against the emergency created by COVID-19, including Executive Order Nos. 104-133, Nos. 135-138, Nos. 140-166, Nos. 168-173, No. 175, Nos. 177-181, No. 183, Nos.

2

186-187, Nos. 189- 198, No. 200, Nos. 203-204, No. 207, and Nos. 210-211 (2020) and Nos. 214-216, Nos. 219-220, Nos. 222-223, No. 225, Nos. 228-235, Nos. 237-244, No. 246, and No. 249 (2021), the facts and circumstances of which are all adopted by reference herein; and

WHEREAS, on June 4, 2021, I signed Assembly Bill No. 5820 into law as P.L.2021, c.103 and issued Executive Order No. 244, which terminated the Public Health Emergency declared in Executive Order No. 103 (2020) but maintained the State of Emergency declared in that same Order; and

WHEREAS, P.L.2021, c.103 provided that following the termination of the Public Health Emergency declared in Executive Order No. 103 (2020), the Governor may continue to issue orders related to implementation of recommendations of the Centers for Disease Control and Prevention ("CDC") to prevent or limit the transmission of COVID-19, including in specific settings; and

WHEREAS, the American Academy of Pediatrics ("AAP") has emphasized that in-person learning is critical for educational and social development of children, as evidence demonstrates that remote learning has been detrimental to the educational attainment of students of all ages and has exacerbated the mental health crisis among children and adolescents; and

WHEREAS, the CDC has also cited evidence that suggests virtual learning can lead to learning loss for children and worsening mental health problems for the younger population; and

WHEREAS, the CDC has reported that new variants of COVID-19 have been identified in the United States, and that certain variants, particularly the B.1.617.2 ("Delta") variant, are more transmissible; and

3

WHEREAS, given new evidence regarding transmission of the Delta variant, the CDC now recommends universal indoor masking for all teachers, staff, students, and visitors in K-12 schools, regardless of vaccination status; and

WHEREAS, the CDC continues to emphasize that children should return to full-time in-person learning in the fall with layered prevention strategies in place, such as masking in indoor settings; and

WHEREAS, AAP similarly recommends universal masking in schools because a significant portion of the student population, specifically individuals under the age of 12, is not yet eligible to receive a vaccine; and

WHEREAS, there is no concrete timeline for authorization for use of currently available COVID-19 vaccinations for children under the age of 12, so it would be impossible for that group to be fully vaccinated before the start of the 2021 – 2022 school year; and

WHEREAS, only the Pfizer vaccination is currently available to youth in the 12 – 17 age group; and

WHEREAS, according to data estimates, only 40 percent of 12 - 15 year-olds and 57 percent of 16 – 17 year-olds in New Jersey have received at least one dose of a COVID-19 vaccine; and

WHEREAS, both the CDC and AAP recognize that masking is a critical tool to reduce transmission of the virus and protect unvaccinated individuals; and

WHEREAS, the State has experienced significant upticks in critical COVID-19 metrics over the past few weeks, including COVID-19 positive cases, the rate of transmission, spot positivity, and new hospitalizations, that warrant additional

4

precautions in certain settings with a substantial number of unvaccinated individuals; and

WHEREAS, after consultation with the New Jersey Department of Health, I have determined that it is necessary to enforce a uniform masking policy in schools for students, staff, and visitors while vaccination is not available to a significant portion of the student population; and

WHEREAS, this Order is consistent with the terms of P.L.2021, c.103;

NOW, THEREFORE, I, PHILIP D. MURPHY, Governor of the State of New Jersey, by virtue of the authority vested in me by the Constitution and by the Statutes of this State, do hereby ORDER and DIRECT:

1.   All public, private, and parochial preschool programs and elementary and secondary schools, including charter and renaissance schools (collectively "school districts"), must maintain a policy regarding mandatory use of face masks by staff, students, and visitors in the indoor portion of the school district premises, except in the following circumstances:

      a.   When doing so would inhibit the individual's health, such as when the individual is exposed to extreme heat indoors;

      b.   When the individual has trouble breathing, is unconscious, incapacitated, or otherwise unable to remove a face masks without assistance;

      c.   When a student's documented medical condition or disability, as reflected in an Individualized Education Program (IEP) or Educational Plan pursuant to Section 504 of the Rehabilitation Act of 1973, precludes use of a face mask;

5

    d.   When the individual is under two (2) years of age;

    e.   When the individual is engaged in activity that cannot physically be performed while wearing a mask, such as eating or drinking, or playing a musical instrument that would be obstructed by a face mask;

    f.   When the individual is engaged in high-intensity aerobic or anaerobic activity;

    g.   When a student is participating in high-intensity physical activities during a physical education class in a well-ventilated location and able to maintain a physical distance of six feet from all other individuals; or

    h.   When wearing a face mask creates an unsafe condition in which to operate equipment or execute a task.

2.   This Order shall not impact the obligation of any school district to comply with requirements issued by the CDC on masking on public transportation conveyances, including school district transportation.

3.   The State Director of Emergency Management, who is the Superintendent of State Police, shall have the discretion to make additions, amendments, clarifications, exceptions, and exclusions to the terms of this Order.

4.   It shall be the duty of every person or entity in this State or doing business in this State and of the members of the governing body and every official, employee, or agent of every political subdivision in this State and of each member of all other governmental bodies, agencies, and authorities in this State of any nature whatsoever, to cooperate fully in all matters concerning

6

this Order, and to cooperate fully with any Administrative Orders issued pursuant to this Order.

    5.   No municipality, county, or any other agency or political subdivision of this State shall enact or enforce any order, rule, regulation, ordinance, or resolution which will or might in any way conflict with any of the provisions of this Order, or which will or might in any way interfere with or impede its achievement.

    6.   Penalties for violations of this Order may be imposed under, among other statutes, <u>N.J.S.A.</u> App. A:9-49 and -50.

    7.   This Order shall take effect on Monday, August 9, 2021 and shall remain in effect until revoked or modified by the Governor.

                                GIVEN, under my hand and seal this
                                    6th day of August,
                                  Two Thousand and Twenty-one,
                                  and of the Independence of
                                  the United States, the Two
                                  Hundred and Forty-Sixth.

[seal]

                                /s/ Philip D. Murphy

                                Governor

Attest:

/s/ Parimal Garg

Chief Counsel to the Governor