## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CYNTHIA STEPIEN on behalf of herself and her minor child; STAMATIA DIMATOS SCHRECK, on behalf of herself and her three minor children; RYAN CODY, on behalf of himself and his minor child J.C.; KELLY FORD on behalf of herself and her minor child A.F.; GABE MCMAHON; M.F.; M.K.N.; K.B.; B.W.; L.R.; J.V.P.; V.P.; D.M.; B.M.; A.M.; DANIELLE ESCAYG; and ALL OTHERS SIMILARLY SITUATED, | Index No.: 21-cv-13271 |
| Plaintiffs, | |
| v. | |
| PHILIP D. MURPHY, Governor; ANGELICA ALLEN-McMILLAN, Commissioner of Education; JUDITH M. PERSICHILLI, Commissioner of Health, | |
| Defendants. | |

## PLAINTIFFS' BRIEF IN SUPPORT OF APPLICATION FOR PERMANENT INJUNCTIVE RELIEF OR, IN THE ALTERNATIVE, TEMPORARY RESTRAINTS ON THE EXECUTION OF EXECUTIVE ORDERS 251 AND 253

Bruce I. Afran
Attorney-at-Law
10 Braeburn Dr.
Princeton, New Jersey 08540
609-454-7435 (cellular)
bruceafran@aol.com
NJ Attorney ID 010751986
*Counsel for Plaintiffs*

i

**TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………………………1

PRELIMINARY STATEMENT……………………………………………………………2

ARGUMENT…………………………………………………………………………...14

I.    EXECUTIVE ORDER 251 BURDENS AND IMPAIRS STUDENTS' PROTECTED
      RIGHTS OF ASSOCIATION, PRIVACY AND SPEECH……………………………14

      A.   Schoolchildren Retain Their Fundament Rights Under The First
           Amendment……………………………………………………………………14

      B.   "Personal Intercommunication" Among Students is a Protected Right That is
           Violated By Executive Order 251………………………………………………14

      C.   First Amendment Doctrine Extends The Right Of Free Association To Non-
           Political Social Relations and The Right to Pursue Such Casual Relationships
           By Children and Adults…………………………………………………………16

      D.   The School is The Social Center Of Children's Lives and Their Own Public
           Forum in Which Their Associative Rights Are Suppressed By The Masking
           Mandate…………………………………………………………………………20

      E.   Executive Order 251 Imposes Deep And Substantial Burdens on Speech and
           Associative Rights and is Not Minimally Intrusive……………………………...27

II.   THE EXECUTIVE ORDER CONTAINS NO SUBSTANTIVE FINDINGS TO
      JUSTIFY THE IMPOSITION OF THE MASKING MANDATE ON
      SCHOOLCHILDREN……………………………………………………………………..31

III.  EQUAL PROTECTION IS VIOLATED BY THE GOVERNOR'S TARGETING OF
      SCHOOLCHILDREN AND TEACHERS WHILE LEAVING ALL OTHER NEW
      JERSEY RESIDENTS FREE OF ANY RESTRAINTS AT ALL OTHER PUBLIC
      AND PRIVATE LOCATIONS……………………………………………………35

CONCLUSION………………………………………………………………………...37

# TABLE OF AUTHORITIES

## Cases

*Bellotti v. Baird*
443 U.S. 622 (1979) ...........................................................................................14

*Bethel Sch. Dist. v. Fraser*
478 U.S. 675, 106 S. Ct. 3159 (1986 ...................................................................23

*Bykofsky v. Borough of Middletown*
401 F. Supp. 1242 (M.D.Pa.1975), *aff'd without opinion,* 535 F.2d 1245 (3d Cir.),
*cert. denied,* 429 U.S. 964, 97 S. Ct. 394, 50 L. Ed. 2d 333 (1976)..................17, 18

*Cave v. E. Meadow Union Free Sch. Dist.*
480 F. Supp. 2d 610 (E.D.N.Y. 2007)...................................................................21

*Courthouse News Serv. v. Yamasaki*
312 F. Supp. 3d 844 (C.D. Cal. 2018) ...................................................................30

*D.B. v. Ocean Twp. Bd. of Educ.*
Civ. No.: 96-2361 (MLP), 1997 U.S. Dist. LEXIS 20395 (D.N.J. Nov. 21, 1997)....................23

*Del Piano v. United States*
575 F.2d 1066 (3d Cir. 1978).................................................................................30

*Gillman v. Sch. Bd. for Holmes Cty.*
567 F. Supp. 2d 1359 (N.D. Fla. 2008) .................................................................24

*Griswold v. Connecticut*
381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965) ...........................................16

*Hodgkins v. Peterson*
355 F.3d 1048 (7th Cir. 2004)...............................................................................28

*J.E.B. v. Ala. ex rel. T.B.*
511 U.S. 127 (1994).............................................................................................30

*Kreimer v. Bureau of Police*
958 F.2d 1242 (3d Cir. 1992).................................................................................14

*L.W. v. Knox Cty. Bd. of Educ.*
Civ. No. 3:05-CV-274, 2006 U.S. Dist. LEXIS 76354 (E.D. Tenn. Sep. 6, 2006)....................22

*M.B. v. Liverpool Cent. Sch. Dist.*
487 F. Supp. 2d 117 (N.D.N.Y. 2007) ......................................................21

*McCullen v. Coakley*
134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014).........................................19,20

*McIntyre v. Ohio Elections Comm'n*
514 U.S. 334, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995)..........................19

*McKenna v. Peekskill Hous. Auth.*
647 F.2d 332 (2d Cir. 1981).............................................................17,18,20

*Miss. Univ. for Women v. Hogan*
458 U.S. 718, 73 L. Ed. 2d 1090, 102 S. Ct. 3331 (1982) ................34,36,37

*N.A.A.C.P. v. Alabama*
377 U.S. 288, 84 S. Ct. 1302, 12 L. Ed. 2d 325 (1964) ...............................16

*Publicker Industries, Inc. v. Cohen*
733 F.2d 1059 (3d Cir. 1984)..........................................................16,30

*Raker v. Frederick Cty. Pub. Schs*
470 F. Supp. 2d 634 (W.D. Va. 2007) ......................................................21

*Ramos v. Town of Vernon*
353 F.3d 171 (2d Cir. 2003)...........................................14,18,20,34,45,56

*Rivera v. E. Otero Sch. Dist.*
721 F. Supp. 1189 (D. Colo. 1989) ..........................................................21

*Sawyer v. Sandstrom*
615 F.2d 311 (5th Cir. 1980)...........................................................17,18,20

*Schuette v. Coalition to Defend Affirmative Action*
572 U.S. 291 (2014) ...............................................................................37

*Sinaloa Lake Owners Asso. v. Simi Valley*
882 F.2d 1398 (9th Cir. 1989)............................................................33,34,35

*Slotterback v. Interboro School Dist.*
766 F. Supp. 280 (E.D. Pa 1991) .............................................................14

*Tinker v. Des Moines Independent Community School District*
393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ...............................14,15,16,21,22

*Turner Broad. Sys. v. FCC*
520 U.S. 180, 117 S. Ct. 1174 (1997).......................................................28,29

*United States v. Boyles*
57 F.3d 535 (7th Cir. 1995)...................................................................30

*United States v. O'Brien*
391 U.S. 367, 88 S. Ct. 1673 (1968) ..........................................28,34,36,37

*Wilson v. Taylor*
733 F.2d 1539 (11th Cir. 1984)...........................................................16,17,18

**New Jersey Constitutional Provisions**
Const. of New Jersey, Art, IV, Sec. IV, Cl. 6 ...............................................33
Const. of New Jersey, Art. VIII, Sec. 2, Cl. 3(e) .......................................33
Const. of New Jersey, Art. IV, Sec. VI, Cl. 4..............................................33

**INTRODUCTION**

This memorandum of law is respectfully submitted in support of plaintiffs' application

for order to show cause as to vacating Executive Order 251 that mandates masking for all New

Jersey schoolchildren.  The Executive Order impairs and burdens the First Amendment rights of

schoolchildren within the schools, the children's primary forum for the exercise of such rights,

by chilling most forms of childhood speech and association, as described by declarants on this

motion.  Further, the order violates equal protection by imposing masking orders only upon

schoolchildren while leaving all other demographic groups free of Covid restraints at all other

public and private locations (except for health and mass transit facilities).

The Executive Order also fails substantive due process because: 1) it fails to identify an

objective metric or criteria for triggering the masking mandate or for its termination; 2) it

authorizes unlimited "additions" or "amendments" in the sole discretion of an unelected official,

the Director of the State Police, *see* Executive Order 251, Section "3"; and 3) it bars any elected

body from approving any resolution or ordinance that would conflict with, impede or interfere

with the Order's measures. *See* Executive Order 251, Section "5".

In addition, the Executive Order deprived plaintiffs of procedural due process because the

Governor, eighteen (18) months after the onset of the "emergency", has refused to enable the

public or experts to comment on the masking orders via hearings under the Administrative

Procedure Act, N.J.S.A. §52:14B-1, et seq., nor has any record of the Governor's proceedings

been made available for the public.

This application seeks permanent injunctive relief barring the enforcement or execution

of Executive Order 251 (and relevant parts of Executive Order 253) or, in the alternative,

1

temporary and preliminary restraints staying enforcement as of the commencement of the

statewide school year on or about September 10, 2021.

These matters are addressed below.

# PRELIMINARY STATEMENT

On May 24 of this year, New Jersey Governor Phil Murphy lifted all Covid restrictions

on business and personal activity as to all population groups and in all settings (except for health

care and mass transit facilities) with the singular exception of schoolchildren who were kept

under continuing stringencies through July 4, 2021. *See e.g.* Executive Order 241; https://nj.gov/

infobank/eo/.

Such restraints on schoolchildren consisted of mandatory masking for full school days; a

requirement to remain six feet apart from every other person while indoors at any school;

isolation in classrooms behind plexiglass shields surrounding each student's desk; separation

from teachers who taught behind glass shields; students kept forcibly at individual lunch tables

that barred conversation or discussion; and kept separated from each other in school hallways

and after school activities.  Such measures expired on July 4, 2021. *See e.g.* Second Amended Complaint and the Certifications filed on this motion.[1]

On August 6, 2021 the Governor issued Executive Order 251 reinstating the masking requirement for all public and private school students when school resumes this September, exempting only those students whose disabilities prevent use of the mask, a leniency that leaves the vast majority of New Jersey's 1.4 million students (and teachers and staff) subjected to this continuing stricture.

The Executive Order contains no objective metric or criteria to explain why the Governor re-imposed the mandate but makes the generalized claim that "significant upticks" in Covid cases require reinstatement of such rules.  *See* Executive Order 251, annexed to Second Amended Complaint.  No such rules have been re-imposed by the Governor on any other population groups at any other public or private settings regardless of vaccination status (other than at health care or mass transit facilities).

None of this was accomplished with parental input or permission, or by any resolution adopted after hearings at school boards or by any regulation issued under New Jersey's

---

[1] The following certifications are submitted with the motion:

1.      Certification of M.F.
2.      Certification of A.F.
3.      Certification of B.W.
4.      Certification of K.B.
5.      Certification of A.M.
6.      Certification of John Zammit
7.      Certification of Connie Giobinazzi
8.      Certification of Robert Wilbur
9.      Certification of Rhiannon Mindas
10.     Certification of Addison M.
11.     Certification of Jessica Marchese

Administrative Procedure Act, N.J.S.A. §52:14B-1, et seq., with an opportunity for parents, students or teachers to comment or testify as to the need for, or the likely impacts of, such stringent regulation of children, never before imposed in New Jersey or elsewhere in the United States.

The effect of the masking order is not trivial but extends to the entire life of the child in school. Under masking and segregation regimes, as practiced pursuant to Executive Order 175 and continued under Executive Order 241, children have become riven with "fear and anxiety"; see e.g. Certification of A.F. at ¶5,[2] many have become unwilling to speak in class or to associate with other children, have lost contact with their friends whose faces they can no longer see, have suffered depression from the regime of masking and isolation in schools, as Fifth Grader Teacher Rhiannon Mindas said of her students and of her own three children of varying ages. *See e.g.* Certification of Rhiannon Mindas at ¶¶7-16.  Multiple witnesses have testified to such facts on theirdeclarations filed with this motion; their testimony is also described below.[3]

As a result of the masking orders, a new and previously unknown form of discipline has entered New Jersey's schools, testified to by plaintiffs and teachers on this motion.  Students are

_____

[2] Declarants who are minors are identified by initials or \ their first name followed by an initial to maintain privacy, as per court rules.  With the exception of Addison M., who is not a plaintiff, the full names of the minor affiants are on the sealed docket; all names are available from counsel.

[3] Student and teacher declarants testify that personal and social interaction between students virtually ceased under masking (Zammit Cert. at ¶¶9-10;17-21; Mindas Cert. at ¶¶5,7,18; Giobinazzi Cert. at ¶5; Certification of Jessica Marchese at ¶¶4-5; Cert. K.B. Cert. at ¶¶3-5; B.W. Cert. at ¶20-23; M.F. Cert. at ¶¶3-5); that cafeterias were silent and lost their role as a social center of students' lives, (Zammit Cert. at ¶¶12-13; Mindas Cert. at ¶19; Certification of Robert Wilbur at ¶¶21-22;  A.M. Cert. at ¶12; Addison M. Cert. at ¶¶12-14; B.W. Cert. at ¶¶15-17; K.B. Cert. at ¶6); and that students ceased to participate under masking (Zammit Cert. at ¶¶8,10,13,16-18,20-21,23; Mindas Cert. at ¶¶4,9; Giobinazzi Cert. at ¶8; Marchese Cert. at ¶¶5-9; Addison M. Cert. at ¶6; Wilbur Cert. at ¶12; Addison M. Cert. at ¶6-7.

continually threatened with discipline by teachers if masks fall below their nose, if they refuse to wear the mask or remove it for even short periods; such chastisement has ensued throughout the school day, often multiple times per day per student. *See e.g.* Certification of B.W. at ¶12; Certification of John Zammit at ¶11; Certification of K.B. at ¶8; Certification of A.M. at ¶14.

An example of such constant discipline is provided by plaintiff B.W. who said the policy was intended to "instill fear" to force children to wear the mask:

> Some teachers were very understanding but others were absolutely relentless and would repeatedly tell you to pull the mask up; they would threaten people to instill fear so you would actually wear it.

B.W. Cert. at ¶12.

Student K.B. spoke of the effect of this discipline upon children and how it harmed the relationship with her teachers:

> The constant reminders to keep my mask up when it slips down a bit makes me have a bias towards some of the teachers who remind me constantly; two threatened to write me up. I get sick and tired of hearing it so it causes me to be a little more angry when someone tells me to pull it up. In a normal year you would not need to constantly hear, "keep your mask up". I would be more comfortable with my teachers and not worry about being written up for how I breathe  But now I am annoyed with my teachers and don't even look forward to their classes even though I used to enjoy them.

K.B. Cert. at ¶8.

Plaintiff A.M. testified as to how masking discipline converted her relationship with teachers from that of "friend" to one of alienation:

> So many teachers want us to feel school is their safe place but they are enforcing something that makes me not even want to participate.  In the past couple of years teachers have always told me that they are supposed to be my friends, that I am supposed to let them know if I ever need anything and not to afraid to tell them if I need to speak about anything in my life. Many teachers have a sign on their door that their room is a "safe space" but when they tell me to pull my mask up it

makes me turn away form them; it no longer appeals to me that they want to be my friend.

A.M. Cert. at ¶14.

Seventh grade civics teacher John Zammit testified as to the impact of constant mask reprimands on the morale of students and their relationships with teachers. He said, as did A.M., that masking discipline negated school as the "safe place" for children:

> In our modern educational system, the classroom is built around group learning and instruction but due to the masking orders there were no social interactions. The hallways were like a Zombie apocalypse, a phrase used by teachers at the school during the past year. Students were miserable and were not talking to each other but they were being reprimanded almost constantly for the mask falling or being too close together.   You even saw less conversation between teachers and students.

> I saw too many instances where a child was being reprimanded because they would not put the mask on or if it fell below their nose.  As an educator I feel students need to feel they are in a safe place, where they can grow, where they can express themselves.   There has never been a more difficult year in which you could get kids to express themselves (except those fully remote at home).  I have never had a year in which so many kids did not turn work in.

> Zammit Cert. at ¶¶10-11 [emphasis added]; *see also* K.B. Cert. at ¶8; B.W. Cert. at ¶¶4,12.[4]

Plaintiffs and teachers have testified as to the lack of interaction and participation by students under the masking orders.  Teacher Jessica Marchese, in her certification, explains the lack of participation among her students who attended school in-person wearing masks; she contrasts this with the active participation of students who were at home, unmasked. Marchese

---

[4] During the statewide masking mandates adults were not subject to arbitrary and constant imposition of the police power of the state for every moment of their daily lives, forcing mask discipline; no police officer would assume the power to walk up to a citizen multiple times per day threatening official action if a mask was not pulled over the nose, as teachers have done throughout the State, as the declarants have stated.

describes how in an art class there is normally extensive discussion and conversation between students but this was completely absent under masking. *See* Certification of Jessica Marchese at ¶¶5-7.

John Zammit describes the loss of student interaction and the impairment of interaction between students and teachers caused by masking:

> I found it challenging to have discussions with students because I am wearing a mask and they could not see my facial expression. This was of significance as we had discussions in my American Civics class on subjects that impact society. The lack of facial expression affects my ability to give reassurance to a student if I am acknowledging one side of a person's argument, especially if they took an unpopular position such as endorsing the Second Amendment, a subject that was controversial this year in view of the protests surrounding the death of George Floyd. If a student is addressing such issues and their father is a police officer, you need to be able to reassure them and provide them support and encouragement for participating and for their a willingness for being honest and transparent. With the mask on you are just nodding your head like a robot and cannot give these non-verbal cues.

> Other subjects of a controversial nature were raised to which I could not respond fully due to my face being masked. For example, many kids asked me who gets to determine what is an "essential" business under the Governor's executive orders. And they're only 12 years old. With the mask I cannot give any emotional response. I can't smile. I must be more robotic because I lose that non-verbal context.

> With faces being covered it completely removes the social and emotional well-being of any school experience, either in the classroom or on stage at graduation. When you are working with a student you are trying to elevate their understanding of reading or some other area but you can't even tell if they are struggling since all you can see is the forehead and eyes. Some of the most common feedback I receive as a teacher is observing the grin, the smirk, the smile, the not biting your lip, the "I kind of get it" gesture. In such case, I can see and understand that the student seems ambivalent. With masking, I lose all of that feedback and so does the student.

> Without a doubt kids show by expression what they need. With masking I saw a significant difference in kids asking for help. I would ask, "Do you understand this question" and you can't see but they are making a reaction with their face

under mask and you can't tell what they are thinking .  You get the sense that you are making them more uncomfortable because you can't read them and you give them some space and come back later and they say, "No I am good now", and they don't want help.

Zammit Cert. at ¶¶17-20.

Facial cues and gestures are lost due to masking, interfering with children's normal communication, causing an almost complete absence of speech in hallways and cafeterias and in classrooms, as set forth in the Second Amended Complaint and on the certifications submitted with this motion.  Multiple witnesses, including teachers, have testified as to the "dead" silence and "zombie-like" atmosphere in the hallways under masking orders, normally busy and cheerful thoroughfares.  Zammit Cert. at ¶¶9,17-21; Mindas Cert. at ¶¶5,7,18; Giobinazzi Cert. at ¶5; Certification of Jessica Marchese at ¶¶4-5; Cert. K.B. Cert. at ¶¶3-5; B.W. Cert. at ¶20-23; M.F. Cert. at ¶¶3-5.   The witnesses also testify to the absence of interaction and communication in cafeterias under masking regimens, normally the social center of a child's school experience. Zammit Cert. at ¶¶12-13; Mindas Cert. at ¶19; Certification of Robert Wilbur at ¶¶21-22;  A.M. Cert. at ¶12; Addison M. Cert. at ¶¶12-14; B.W. Cert. at ¶¶15-17; K.B. Cert. at ¶6.

Teacher Jessica Marchese has described how the absence of facial communication interfered with student participation and expression:

This was a major difference from the pre-mask period.  These are high school students and it could be difficult at times to get them to speak but when you added the mask into the picture they were zombie-like; they had their heads on the desks, there was more daydreaming, a whole lot more. It was very hard for them to talk and it was difficult for me to see if they were understanding the content because I could not see their facial expressions.  It was very hard for me to see if they were struggling when they were masked. I don't even think they were focusing on the lesson.

8

Marchese Cert. at ¶5; *see generally* Marchese Cert. at ¶¶4-7.  She added: "With masking in the classroom there was no participation…". *Id.* at ¶9.

As one example, student Addison M.said that she ceased to participate in class while wearing the mask.  Addison M. Cert. at ¶6.  Other students have testified as to the lack of participation under masking.  *See e.g.* Wilbur Cert. at ¶12; Addison M. Cert. at ¶6-7.  Teacher John Zammit testified in detail as to the lack of participation and student interaction under masking.  Zammit Cert. at ¶¶8,10,13,16-18,20-21,23.  Other teachers have testified to the lack of participation.  Mindas Cert. at ¶¶4,9; Giobinazzi Cert. at ¶8; Marchese Cert. at ¶¶5-9.

Fifth grade teacher Rhiannon Mindas observed that students began to socialize normally only *after* the masks came off:

> Not until June, when it became hot, were we allowed to have the masks made optional. At this time the kids began to socialize with each other and began to criticize one another, to be sarcastic as ten year olds will do. Until this time the children had had no opportunity to socialize and act out in a normal way for this age group.
>
> *****
>
> After the masks came off, it was an evolution into having conversations again. When the masks were on, they did not joke around with each other but there was banter once again after the masks came off.  All of this is very important to fifth graders: it gives them a sense of when the joke goes too far and they have to learn to apologize, learn the limits and read social cues.  Ordinary conversation and banter by children also lightens the mood of the classroom; the joking around is important to their education because it allows them to find humor in things. Humor that came through the computer chat was more likely to be inappropriate because the kids had a sense of bravery that they did not have when they were speaking out loud.  But when they would verbalize again, after the masks were removed, their humor became more natural and less inappropriate.  Some kids, of course, would always speak but the quiet kids started speaking out only when the masks came off.

Mindas Cert. at ¶¶7,18.

Teacher Mindas also spoke to the impacts on her own children from the masking policy in her district, namely "depression" and isolation, "monotony" and a lack of "joy" in the school days, the inability to make friends and a drop in grades.  Id. at ¶¶13-16.

Student A.M. said that school ceased to be a source of enjoyment and that she feels her high school years are being taken from her because of the masking regimen.  A.M. Cert. at ¶¶10,13.  Addison M. also spoke of the loss of joy caused by the masking regime.  Addison M. Cert. at ¶5.  Teacher Mindas said that her

> "high school daughter was a freshman last year and she suffered severe depression and self harm. She reported to me as to 'the monotony of the days' and that 'there's no more joy left in school' ".

Mindas Cert. at ¶15.  Teacher Zammit said that under masking regimens "it felt like a 'Zombie apocalypse', children walking looking down, looking deflated."  Zammit Cert. at ¶22.  He said that the "energy of life" so "[t]ypically" found in a high school "was almost non-existent" under masking.  Id.  Student interactions virtually disappeared under masking.  Zammit Cert. at ¶¶8-9,14-15.

Students have spoken directly about the loss of facial cues caused by masking in student-to-student communication and in discussion between students and teachers.  See e.g.  K.B. Cert. at ¶¶3-5.  Student B.W. described her own reliance on facial cues in speech that is impossible under the masking mandate:

> Wearing the masks, someone could speak and you barely even know who it is unless you know their voice. You can't see what someone is doing under the mask. You can't see their mouth or their nose. You can't see any facial expressions. It is confusing. For me facial expression have a lot to do with communicating. Your face reveals all, especially because I went 14 years without

anything like this. I went my whole life with these social cues that you must now start from scratch revolving around the mask.

B.W. Cert. at ¶20.

B.W. spoke to the decline in her own mental state and loss of "self esteem" due to the isolation and disjuncture caused by masking.  B.W. Cert. at ¶19.  She notes the "social aspect" of school has been lost under masking.  Id. at ¶23. Robert Wilbur who graduated this past spring, called the school "environment" under masking "dystopian", Wilbur Cert. at ¶18, and deprived him of the "validation" that comes from seeing the faces of his teachers.  Id. at ¶10; see also Giobinazzi Cert. at ¶6; Certification of M.F. at ¶¶3-5 (all speaking to the loss of validation caused by masking).  M.F. noted that he relies "heavily on people's expression and emotions" but "when others are wearing masks [] they are emotionless as far as I can see".  M.F. Cert. at ¶¶3-4.

All schoolchildren have lost ordinary social intercourse and interaction while in school due to the masking of faces and forced isolation and segregation of the Covid mandates. Wilbur Cert. at ¶¶3-5,9,11-3; Addison M. Cert. at¶5,9-11; Giobinazzi Cert. at ¶¶11-13; Zammit Cert. at ¶¶8-9,14-15; M.F. Cert. at ¶¶3-5.  Masking has caused social inhibition among students.  A.M. Cert. at ¶¶3,5-6,13; Mindas Cert. at ¶¶4-8,10-11; A.F. Cert. at ¶5.  Teacher Mindas reports such inhibition experienced by her own children, as well. Mindas Cert. at ¶¶12,14-16,18.  As Mindas testifies, students under masking demonstrated negative social behaviors *that ceased when masking ceased*.  Mindas Cert. at ¶¶4-9;17-19.  Multiple witnesses, both teachers and students, reported inhibition of speech itself under masking.  See e.g. Zammit Cert. at ¶16; Giobinazzi Cert. at ¶10; Mindas Cert. at ¶¶12,17-18; K.B. Cert. at ¶¶7-8,17-20; A.M. Cert. at ¶6; A.F. Cert.

11

at ¶3-5.  Students' development of association and friendship has been almost completely suppressed by the effect of masking,  See Point I-D, infra at 20-27.

What has ensued in New Jersey's schools is a vast social experiment imposed on children that impairs and burdens associative, speech and privacy rights.  This has been accomplished without the permission of parents, without the benefit of any public hearing and without any apparent study by any expert as to the impacts of such regime upon children; if such a study was conducted, it has never been released by defendants. No compelling basis or substantial governmental interest can support such continued practices as to schoolchildren and teachers when the Governor and his Commissioners have released all such burdens *on all other persons and groups in society.* Indeed, the failure of defendants to impose such restraints on any other groups or persons deprives Executive Order 251 of any urgent need for enforcement, further ground for a stay as of the opening day of school.

Executive Order 251 is inherently arbitrary as 1) it contains no objective standards for the re-imposition of the masking mandate or its termination, 2) it is indefinite in duration and 3) it can be expanded at the whim of the Superintendent of the State Police to whom the Governor has given unlimited discretion to make "amendments", "additions" and "clarifications" to the order at will.

In addition, the Executive Order impinges on the First Amendment rights of elected officials of all boards, governing bodies and other elected entities by prohibiting the passage of any resolution or ordinance that would contradict or impede the execution of the masking mandate. See Executive Order 251, annexed to Second Amended Complaint.

12

The application seeks to permanently enjoin all such practices as to New Jersey schoolchildren or, in the alternative, seeks a stay of enforcement of Executive Order 251 as of the first day of school on or about September 10, 2021, pending hearing on the merits.

Inasmuch as the masking order impairs the students' First Amendment rights, *see* Point I, *infra*, a strong presumption of irreparable harm arises supporting entry of temporary relief. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2689-90, 49 L. Ed. 2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

# ARGUMENT

I.   **EXECUTIVE ORDER 251 BURDENS AND IMPAIRS STUDENTS' PROTECTED RIGHTS OF ASSOCIATION, PRIVACY AND SPEECH.**

   A.   **Schoolchildren Retain Their Fundament Rights Under The First Amendment.**

American schoolchildren are "persons under our constitution" and "possessed of fundamental rights which the State must respect." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969). As to fundamental liberty interests, "the child's right is virtually coextensive with that of an adult." *Bellotti v. Baird*, 443 U.S. 622, 634 (1979). A court must take special concern to enforce children's rights because their very "immaturity and dependency. . .impede minors' relative ability, as a class, to articulate or mount an effective defense against [] a restriction". *Ramos v. Town of Vernon*, 353 F.3d 171, 181 (2d Cir. 2003)(voiding a curfew and noting that children require special protection for constitutional interests because they lack the capacity to use the "political processes" designed to "protect minorities".) In sum, schoolchildren are fully protected under the Constitution and a court must be especially solicitous that their rights are not suppressed, even inadvertently, by state action.

   B.   **"Personal Intercommunication" Among Students is a Protected Right That is Violated By Executive Order 251**.

In *Tinker*, the Supreme Court recognized that the educational development of students goes beyond the classroom and that "personal intercommunication among the students" is both inevitable and "is also an important part of the educational process." *Tinker*, 393 U.S. at 511-514; *cf., Kreimer v. Bureau of Police*, 958 F.2d 1242 (3d Cir. 1992)(distinguishing *Tinker* from a case concerning a public library where such "intercommunication" was not a part of the library's

14

essential mission while acknowledging the role of "intercommunication among the students" in public schools); *see also Slotterback v. Interboro School Dist*., 766 F. Supp. 280, 290 (E.D. Pa 1991)(court adding emphasis to *Tinker's* holding that "intercommunication" among students is "an important part of the educational process.").

*Tinker* held that "intercommunication" between students extended to the basic right of association and exchange in the hallways and the cafeterias, places where students meet and congregate as citizens in their own right, as Justice Fortas recognized:

> A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others.
>
> *Tinker,* supra, at 512-513.

The right of "personal intercommunication among the students" being fundamental, *Tinker, supra,* it follows that the *opportunity* for such intercommunication is equally fundamental, and it is such opportunity that is so vigorously suppressed by the masking mandate in Executive Order 251. While government may certainly pursue certain state interests, including mitigating disease, such "controls and regulations cannot sweep so broadly as to infringe upon the constitutional and organic rights of the individual." *Sawyer v. Sandstrom*, 615 F.2d 311, 315 (5th Cir. 1980) (anti-narcotics loitering statute unconstitutional as it interfered with the right of citizens to associate socially in public places).  Pointedly, *Sawyer* did not concern exclusively "political" communication but held that the loitering ban interfered with ordinary association between individuals, precisely the effect of the masking order as to schoolchildren.

15

Logically, students cannot engage in "personal intercommunication among [other] students", *Tinker.*, or have the opportunity to do so, if they are muzzled by masking that obscures actual speech, impairs association between students and bars access to non-verbal forms of communication that are vital to speech and understanding.  *See e.g. Publicker Industries, Inc.* v. *Cohen,* 733 F.2d 1059, 1072 (3d Cir. 1984) ("Social scientists conclude that the face reveals what emotion an individual feels, and body language can show the intensity of that emotion."). As student and teacher declarants have described the masking mandate, it plainly interferes with "personal intercommunication" and the opportunity to do so, resulting in "dead" hallways "like a Zombie apocalypse", Zammit Cert. at ¶10, and a virtually complete absence of student interaction and association, *see generally* pp. 6-12, *supra*; pp. 24-27, *infra*, impairing and impugning protected First Amendment rights of schoolchildren (and their teachers).

### C.    First Amendment Doctrine Extends The Right Of Free Association To Non-Political Social Relations and The Right to Pursue Such Casual Relationships By Children and Adults.

Modern First Amendment associative doctrine originated with *N.A.A.C.P. v. Alabama*, 377 U.S. 288, 307, 84 S. Ct. 1302, 1314, 12 L. Ed. 2d 325 (1964), holding that held a state was not entitled to the names of people who joined an organization to fight segregation but has since advanced to embrace non-political, social contacts, as the Fifth Circuit noted in *Sawyer*:

> This right to freely associate is not limited to those associations which are "political in the customary sense" but includes those which "pertain to the social, legal, and economic benefit of the members." *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S. Ct. 1678, 1681, 14 L. Ed. 2d 510 (1965). "The rights of locomotion, freedom of movement, to go where one pleases, and to use the public streets in a way that does not interfere with the personal liberty of others" are implicit in the first and fourteenth amendments. *Bykofsky v. Borough of Middletown*, 401 F. Supp. 1242, 1254 (M.D.Pa.1975), aff'd without opinion, 535

F.2d 1245 (3d Cir.), cert. denied, 429 U.S. 964, 97 S. Ct. 394, 50 L. Ed. 2d 333 (1976).

*Sawyer v. Sandstrom*, 615 F.2d at 316.

Following *Sawyer,* the 11th Circuit in *Wilson v. Taylor,* 733 F.2d 1539, (11th Cir. 1984), held that the right of association extends to ordinary "social. . .associations", not being limited to political or philosophical interests:

> We follow Sawyer and align ourselves with recent cases holding that the first amendment freedom of association applies not only to situations where an advancing of common beliefs occurs, *but also to purely social and personal associations.*

*Wilson v. Taylor*, *supra*, 733 F.2d at 1544[emphasis added].  In *Wilson* the protected right was merely dating, a right to social association without any higher form of speech, a right that certainly equates to the opportunity for students in the public schools to develop friendships and even romantic involvements as teenagers but, as declarants all show, such opportunities have effectively disappeared under the masking mandate that chills virtually all associational interests.

In *McKenna v. Peekskill Hous. Auth.,* 647 F.2d 332 (2d Cir. 1981), the Second Circuit held that a housing regulation that required notice and approval of tenants' guests violated  the tenants' social associational rights:

> The rule sought to require tenants to disclose to their landlord the identities of any individuals they wished to have as overnight guests, to have those guests approved under a hopelessly broad standard of "reasonableness" and to have the identities of their guests logged in their tenant files. The tenants had to undergo this for each friend or relative they wished to have stay or disregard the Rule and risk the loss of their lease. It would be ignoring the realities of human nature and relationships to conclude that the disclosure of this highly intimate information, coupled with the necessity of registration and advance approval, did not impinge on the tenants' freedom to have whomever they wanted visit their homes.

17

647 F.2d at 335.

Like *Sawyer* and *Wilson* before it, *McKenna* did not predicate its holding on any political

or philosophical association but on the private social relationships that were intruded upon by the

regulation.  In fact, the district court in *McKenna* recognized that First Amendment associational

rights did not require "political" or "hortatory" activities and held that individuals need not have

"distilled the fruits of their relationship into a body of thought or into a political programme" to

assert First Amendment associative rights. *McKenna v. Peekskill Hous. Auth.*, 497 F. Supp. 1217,

1221 (S.D.N.Y. 1980), rev'd other grds. 647 F.2d at 335 ("Simply because a group, or even a

pair, of persons has not distilled the fruits of their relationship into a body of thought or into a

political programme, government interference with their interaction nonetheless implicates the

First Amendment.)

In *Ramos v. Town of Vernon*, 353 F.3d 171, 174 (2d Cir. 2003), the Second Circuit held

that a curfew violated children's rights to travel about the streets and their community even

without any effect on political speech.  *Ramos* noted that the curfew intruded on teenagers'

"rights of locomotion, freedom of movement, to go where one pleases, and to use the public

streets in a way that does not interfere with the personal liberty of others," *id.,* quoting *Bykofsky*

*v. Borough of Middletown*, 401 F. Supp. 1242, 1254 (M.D. Pa. 1975), aff'd, 535 F.2d 1245 (3d

Cir. 1976). Like the decisions in *Sawyer*, *Wilson* and *McKenna*, *Ramos* did not require that the

loss to children's rights consist of interference with "political" speech or meetings.

In *McCullen v. Coakley*, 134 S. Ct. 2518, 2535-37, 573 U.S. 464, 189 L. Ed. 2d 502

(2014), the Supreme Court examined a Massachusetts statute that it described as "truly

exceptional" in its intrusion into associational rights. In *McCullen*, the law criminalized the act of standing within 35 feet of an entrance or driveway to any abortion facility. *Id.* at 2525. Although the Supreme Court found the statute to be content-neutral, it concluded that the law was not narrowly tailored to further the state's substantial interests in "patient access to healthcare" because the practical effect of the law was to prohibit all face-to-face interaction and "even normal conversation" necessary to convey ideas. *McCullen* at 2535-37. Face-to-face interaction, the Supreme Court noted, is "the essence of First Amendment expression" and has no adequate substitute. *Id.* at 2536, quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995).

What *McCullen* called "face-to-face" interaction and "normal conversation" is impossible under New Jersey's school masking regulations since the faces of schoolchildren are not even visible, distorting and forcing all human exchanges into an abnormal milieux, chilling and eliminating the very willingness of children to even talk to each other or their teachers, eliminating nearly all of the non-verbal communication so ordinarily a part of human interaction, leaving muffled physical speech through the mask, a significant problem with children who often speak softly and are inaudible with masking.  Plaintiffs and teachers have testified as to the almost complete disappearance of children's speech and association under the masking orders.[5]

The masking mandate in Executive Order 251 burdens the entirety of the children's daytime lives, covering the entire period when they are attending school and after school activities, six to ten hours per day, every day, the very times when children are most in a position

---

[5] *See also* Cert. K.B. Cert. at ¶¶3-6; B.W. Cert. at ¶15-17,20-23; M.F. Cert. at ¶¶3-5), Wilbur Cert.  at ¶¶12,21-22;  A.M. Cert. at ¶12; Addison M. Cert. at ¶¶6-7,12-14.  *See generally* pp. 6-12, *supra* and 24-27, *infra.*

to have "personal intercommunication" and associate with people outside of their families. As the teachers have declared, such exchanges between children have diminished almost entirely under the masking mandate. Zammit Cert., ¶¶8-10,12-13,16-18,20-21,23; Mindas Cert. at ¶¶4-5,7,9,18-19; Giobinazzi Cert. at ¶¶5,8; Marchese Cert. at ¶¶4-9; *see also* pp. 6-12, *supra* and 23-26, *infra.*

In its scope, sweep and effect covering the entirety of a child's day, Executive Order 251 imposes a burden far more intrusive than those more limited incursions declared unconstitutional in *McCullen*, *McKenna*, *Sawyer* and *Ramos*.

**D.     The School is The Social Center Of Children's Lives and Their Own Public Forum in Which Their Associative Rights Are Suppressed By The Masking Mandate.**

While it may not be readily recognized by adults, schools are *the* forum in which children seek (and obtain) conversation, friendship, dating, exchanges of ideas and association with others, rights that do not require a political dimension to gain First Amendment protection, i.e., the children need not have "distilled the fruits of their relationship into a body of thought or into a political programme". *McKenna, supra,* 497 F. Supp. at 1221.  High School plaintiffs have testified that school is *the* place where they develop friendships and where they see friends and associates. B.W. Cert at ¶¶5,18-19; Wilbur Cert. at ¶¶7-9,21; A.M. Cert. at ¶¶6,10-11,13; Addison M. Cert. at ¶12.  "High school was the cream of the crop when it came to places for my relationships and associational interests…"  Wilbur Cert. at ¶21.  See also A.M. Cert. at ¶10 ("Before the pandemic, I would compare school to a big "friend hangout";…")  Teachers, too, have noted the importance of the school to student socialization.  Zammit Cert. at ¶13; Mindas Cert. at ¶¶5-6,15.

To the child, school is similar to the public streets for an adult, a forum for their own associational interests even if non-students are excluded. See e.g. *Rivera v. E. Otero Sch. Dist*., 721 F. Supp. 1189, 1193 (D. Colo. 1989)("[W]whether or not a school campus is available as a public forum to others, it is clear that the students, who of course are required to be in school, have the protection of the First Amendment while they are lawfully in attendance.").  As the Supreme Court noted in *Tinker*, the education of a child is not limited to, nor does it take place primarily in the classroom, but extends beyond such boundaries to "the cafeteria, or. . .the playing field,. . ." *Tinker* at 512-513.

Case law demonstrates the importance of casual communication and the higher reaches of student speech in the schools.  See e.g. *Cave v. E. Meadow Union Free Sch. Dist.*, 480 F. Supp. 2d 610, 641-642 (E.D.N.Y. 2007)(student's disability assistance "has allowed him to be in the 'mainstream' of the school life, including participation in conversation in the cafeteria and involvement in all the games in the gym."); *Raker v. Frederick Cty. Pub. Schs*, 470 F. Supp. 2d 634, n.1 (W.D. Va. 2007)(student's right to distribute pro-life literature in halls during breaks and to other students as he walked from table to table in the school cafeteria); *Morgan v. Swanson*, 659 F.3d 359, 418 (5th Cir. 2011)(noting in a case concerning a "half-birthday party in the cafeteria during lunch" that the First Amendment protects "private, non-disruptive, non-curricular, student-to-student speech while at school but during non-curriculum times"); *M.B. v. Liverpool Cent. Sch. Dist.*, 487 F. Supp. 2d 117, 123 (N.D.N.Y. 2007)(third grader's right to distribute "20 religious Halloween tracts to friends during lunchtime"); *L.W. v. Knox Cty. Bd. of Educ.*, No. 3:05-CV-274, 2006 U.S. Dist. LEXIS 76354 (E.D. Tenn. Sep. 6, 2006)(right of elementary school student to discuss the Bible with other students during recess)

In their casual discussions and "personal intercommunication", *Tinker, supra,* children of all ages, even young children, often rise well above the trivial and explore the serene and the enlightened subjects.  Children may well speak of "middle school girl thoughts", in itself philosophically vital to any young person's development, see e.g. Certification of A.M, at ¶¶13-14, and they will also speak of religion and God, they may condemn religion and God, they may speak of politics and literature, of Kafka or Stephen King or Game of Thrones, of the beginning of things and the end of things, of the big bang or Genesis, of things that elevate, as well as the banal and the trivial, all of which is their right and vital to their basic humanity.

No declaration is needed to establish the obvious depth and intensity of associative and communicative aspects of childhood.  When this is interrupted and suppressed, as it most certainly is by masking regulations, then the associative, privacy and communication rights of children are impaired and burdened by the Governor's order.[6]

 Although children in school must adhere to an academic schedule and accept instruction, the traditional school day is imbued with frequent opportunities for pursuit of associational rights, i.e., in the halls during class changes, during homeroom, in classrooms during breaks, during lunch hours when middle and high school students traditionally have a substantial degree of freedom to speak and meet and to develop friendships, and in after school clubs and activities, i.e., sports, the school newspaper, the drama club, ethnic clubs, the yearbook and a host of other

---

[6] The undersigned remembers fondly as a high school junior overhearing a group of seniors pompously speaking of Franz Kafka (whose work they were reading in an elective).  The undersigned remembers thinking, "I know these guys and if they can read Kafka, I can read Kafka", thereby leading to a lifelong affection for this Czech writer. This incident, undoubtedly multiplied millions of times in myriad ways throughout our children's experiences, demonstrates that the casual conversation of schoolchildren, without any "political" agenda, enhances their lives and explains why such casual contact is protected under the First Amendment.

organizations. School is where students develop their first romantic attachments, relationships that, by common experience, arise from seeing the face of another person and almost certainly cannot develop in the ordinary case through masking. The ability to develop such relationships (and ordinary friendships) gives a child experience vital to later life and is impaired by mandatory and indefinite masking orders.

The Supreme Court has recognized that non-educational, associational aspects of public school education are vital to the mission of the school and, hence, to the life of children and society:

> The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers -- and indeed the older students -- demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class. Inescapably, like parents, they are role models.

*Cf., Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 683, 106 S. Ct. 3159 (1986).

Our schools are laboratories in which children learn developmental skills and the very ability to work with and associate with other people. *See e.g. D.B. v. Ocean Twp. Bd. of Educ.*, Civ. No.: 96-2361 (MLP), 1997 U.S. Dist. LEXIS 20395, *176-177 (D.N.J. Nov. 21, 1997)(in assigning a disabled child to public school, the "courts must pay special attention to those unique benefits the child may obtain from integration in a local school setting, such as the development of social and communication skills from interaction with nondisabled peers".)

One court has vividly described the intense associational nature of a normal high school with its depth of student communicative and associative activity:

> Ponce de Leon is a typical high school. Davis and several students testified that the approximately four hundred students at the school frequently argue about

23

> sports, social relationships, and topics of interest to teenagers, circulate petitions, and are loud. It is not uncommon for teachers to tell students in class to be quiet and pay attention. Like the typical high school, classes at Ponce de Leon are disrupted every day by students' conversations. Students pass notes during class and whisper to their classmates. Students write on themselves and draw sketches unrelated to their classwork.

*Gillman v. Sch. Bd. for Holmes Cty.*, 567 F. Supp. 2d 1359, 1373 (N.D. Fla. 2008)(addressing a school principal's punishment of a student for publicizing a gay pride issue).

The court's description in *Gilman* highlights the intense and close associative conduct between students that takes place within a typical high school. *Gilman* went on to note that much student discussion occurs quietly, in a "whispered" fashion intended to be private:

> One student testified that students' conversations about gay rights were even quieter than normal conversations because the students were interested in the topic. These activities, which the School Board contends were disruptive - whispering, note-passing, shouting in hallways, writing on bodies, drawing and creating signs, circulating petitions, and debating issues - occur on a daily basis at Ponce de Leon and are divorced from the speech at issue.

567 F.Supp. 2d at 1373.

*Gilman's* discussion of the "typical" high school goes straight to the heart of the problem that arises under the Governor's masking orders: children speak in ways that are often quiet and private, requiring physical closeness if not intimacy, i.e., the "whispering" and the "conversations about gay rights [that[ were even quieter than normal conversations. . ." *Gilman*, 567 F.Supp. 2d at 1373. As *Gilman* so sensitively highlights, student communication and association require the very proximity and intimacy that is lost under the masking orders.

Masking has chilled virtually all speech in the schools, resulting in the "dead silence" of the hallways and the absence of communication and association between students. *See e.g.* Certification of A.M. at ¶11; Zammit Cert. at ¶¶8-10,22; Giobinazzi Cert. at ¶¶ 9,10; Marchese

24

Cert. at ¶¶4-5; Mindas Cert. at ¶¶4,5,9-10,212.  Teachers and students have testified as to the lack

of class participation by masked students.  Zammit Cert. at ¶¶8,10,13,16-18,20-21,23; Rhiannon

Mindas Cert. at ¶¶4,9; Giobinazzi Cert. at ¶8; Marchese Cert. at ¶¶5,7-9; A.M. Cert. at ¶¶ 6-7;

Wilbur Cert. at ¶12.

Students and teachers have testified as to the social inhibition that has resulted from

masking, A.M. Cert at ¶¶3,5-6,13; Mindas Cert. at ¶¶4-8,10-12,14-16,18; A.F. Cert. at ¶5.

Addison M. described, chillingly, the silence ensuing under masking:

> Halls could be filled but were dead silent. It was a scary quiet; the masks made
> people seem unapproachable. I would feel I should not approach people. No one
> wanted to socialize. Halls are normally noisy. It was hard to read peoples'
> expressions or to show emotion when talking while masked.

Addison M. Cert at ¶11. She also observed that "There was none of this conversation this year.

No one cared about anything. You did not talk with anyone inside school.". Addison M. Cert. at

¶10.  Nothing could be clearer as to the near-total suppression of speech and associative activities

under the masking mandate.

Teacher Rhiannon Mindas testified at length about the interference in socialization skills

and development that arose during the mask mandate:

> Not until June, when it became hot, were we allowed to have the masks made
> optional. At this time the kids began to socialize with each other and began to
> criticize one another, to be sarcastic as ten year olds will do. Until this time the
> children had had no opportunity to socialize and act out in a normal way for this
> age group.
>
> It is normally at the lunch table where fifth graders learn to socialize and learn
> how to handle their problems. This past year they did not have the opportunity to
> gain this experience, such as how to handle one another when difficulties arise, in
> the absence of recess or lunch periods. Aside from some minor communication
> and occasional birthday parties that some students planned, their social
> development was delayed throughout the year. The students could not use their

lockers and snack had to be taken with plexiglass barriers up and around each student's desk. Plexiglass shields were attached by velcro to each desk and surrounded three sides. Children in the back of the room were behind so many layers of glass that they could not see the Promethean Board - our classroom smartboard.

The children did not communicate in the beginning of the year. They would only type in the chat room that was available as part of the virtual learning program but would not raise their hand to speak. A lot of negative or inappropriate behaviors came through in the chat that students would not have indulged in had they been speaking verbally. For example, in world language, where an outside teacher ordinarily comes in to the class, the teacher was remote; as she was explaining her background and introduced herself one student typed "nobody cares, just stop". This would not have happened if they were speaking out loud in class.

In June, on the day we were allowed to remove masks, at first the kids were very timid and first wanted to see who else took them off. Once that happened, the goofing around and typical 10- year old behavior started to show itself once more. Before this, it was very quiet; the students had been held back socially throughout the year while wearing the masks. They were quiet and you could not see their personalities.

Certification of Rhiannon Mindas at ¶¶7-10.

Ms. Mindas also noted the isolation of the children even in the classroom and their lack

of willingness to speak in class:

Having the students masked led to a level of isolation. The students would be sitting next to each other in the classroom and would type in the chat rather than speak to one another. The mask definitely inhibited speech in that it muffles their voices and they had to repeat themselves and to talk louder. They were already insecure so shouting out is not something they would do comfortably. Even I would get dizzy with headaches and be out of breath — by the time I got through giving an example on a problem and speaking to the back of the room, I was highly fatigued. The student's attention spans were reduced from normal — it was definitely very hard to keep their attention.

Mindas Cert. at ¶12. Ms. Mindas closed with a chilling statement: "Students lost the ability and

willingness to speak; this was a combined effect of having the computer camera turned off at

home and being masked at school — no one is ever able to see your face.  *Id*.[7]  Once children

took off the masks their socialization began to return to normal.  Mindas Cert. at ¶¶17-18.

As Teacher John Zammit put it, the "typical" energy and life of the school was wholly

absent under masking:

> Typically, a school is a very vibrant place where there is a lot of talking, interacting, yelling or screaming even from excitement or overdramatizing, that energy of life. With the masks it was enormously reduced to the point where it was almost non-existent. The phrase teachers were using in my school is that it felt like a "Zombie apocalypse", children walking looking down, looking deflated.

Zammit Cert. at ¶22.  As he put it, the halls "were like a Zombie apocalypse".  Zammit Cert. at

¶10.

By such assertions, plaintiffs have established a prima facie case of impairment and

intrusion into their associative rights and interests caused by the masking mandate.

### E.   Executive Order 251 Imposes Deep And Substantial Burdens on Speech and Associative Rights and is Not Minimally Intrusive.

Where First Amendment burdens are "incidental" to the State's "health" objective, the

Executive Order's masking mandate is unconstitutional unless the State can demonstrate that its

sweep and scope is "no greater than is essential to the furtherance of that interest."  *United States*

*v. O'Brien*, 391 U.S. 367, 377, 88 S. Ct. 1673 (1968) [emphasis added](regulation against

defacing draft card was sufficiently narrow that it supported the incidental burden on denying

right to protest by burning draft card); *cf. Turner Broad. Sys. v. FCC*, 520 U.S. 180, 117 S. Ct.

1174 (1997)(federal "must carry" rules imposed, at worst, a "modest" burden on cable operators'

---

[7] Ms. Mindas also reports seeing these same problems from masking with her own children, ages 7 and13 and her high school student.  See Mindas Cert. at ¶¶13-16

speech that was no more than necessary to achieve Congressional goal of keeping broadcast stations on cable systems.)[8].

In contrast to the regulations at issue in *O'Brien* and *Turner*, the Governor's masking order imposes deep and substantial burdens on students' fundamental rights for the entirety of every school day, for every hour the students are in school, the bulk of their waking lives outside their home.  This is neither "modest", *Turner*, *supra* at 214-217, nor is it minimally intrusive as in *O'Brien* where the law merely barred the destruction of a small draft card but left all other speech and associative rights intact.  Almost certainly the State cannot show that such imposition on 1.4 million children is "essential" under the *O'Brien* standard since such burden is not imposed on any other element of New Jersey residents who remain free to congregate and gather in unlimited numbers in close proximity, vaccinated or unvaccinated, in all other indoor public and private locations and for any length of time and in any degree of density.  *Only schoolchildren are subject to the masking regimen.*

As students and teachers have testified, the masking measures are all inclusive in the burden they impose on students. Masking begins at the start of each school day; the masks must be worn every minute throughout the school day; exceptions are made only for lunch or one or two very brief breaks during the day for younger children (and in some cases no breaks); children of all ages are chastised throughout the day if their mask is worn incorrectly, subjecting

---

[8] At least one U.S. Court of Appeals has recognized that the *O'Brien* analysis applies to a content-neutral municipal curfew that "incidentally" burdened children's associative rights.  *See e.g. Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004)("The curfew ordinance was enacted to regulate conduct (minors in public at night), but could be seen as having the incidental effect of burdening speech and is therefore subject to the four-prong analysis established in *United States v. O'Brien* [citation omitted]").

them to discipline and anxiety (though they have done nothing by way of misbehavior nor acted to undermine the educational mission of the school); they are kept isolated and segregated from each other at lunch and experience minimal or greatly reduced communication in hallways and other public spaces at school.  As set forth in the declarations, *see generally* pp. 6-12, *supra, and* 24-27, *infra*, such measures have caused a deep and chilling effect on both casual and academic speech in the schools, resulting in a near-complete absence of student communication and participation, causing the "dead" and "Zombie-like" hallways that ensue from masking orders.

Few adults have had to bear such lengthy burden of impaired breathing through mask mandates: a brief trip to the supermarket or a doctor's office in which an adult must wear a mask for a short period does not equate to the full day burden on children, who are physically and emotionally immature but must wear the mask continuously.  During the lockdown, many, if not most, adults have been able to work at home for their full work days without wearing any mask, let alone for 6-10 hours continuously as is in the case of schoolchildren and teachers; and many who wear a mask at work are able to remove it in their private work space. None have the constant strain of school officials chastising and disciplining them throughout the day if the mask slips or if they take a break from the mask. These burdens are not trivial, they are not minimal, they are not "modest". *Cf., Turner, supra*.

While actual speech in school is permitted, it must come through the face mask, often muffled and inaudible, as plaintiffs (and teachers) have testified, and all non-verbal facial cues are lost, a critical aspect of "social communication" as one federal court has acknowledged:

> Social communication includes behaviors such as facial expression, emotional
> gesture, melody (prosody) of speech, and knowledge of social rules (pragmatics)
> of communication that are used in human interaction to convey cognitive and

emotional information. Social communication skills develop early in life and are a primary mode for learning about the environment through non-verbal means.

*Holt v. Sec'y of the HHS*, 2015 U.S. Claims LEXIS 864, n.4 (Ct. Fed. Claims 2015) (noting an expert's view of the role of facial expression in "social communication").  Other courts have commented on the importance of non-verbal cues in understanding speech and emotion.[9]

Such facial cues are critical to the understanding of children's speech and to their very ability to develop a proper understanding of speech:

> Communication involves using and understanding both verbal and nonverbal skills in conversation. This is the social aspect of communication, also referred to as pragmatics. It involves verbal skills related to vocabulary choice and sentence formulation, and non-verbal skills, such as maintaining eye contact and using gestures, facial expressions, and physical postures. . . .When speaking in a conversation, a child must decide what to say and how to say it, using appropriate vocabulary and following the rules of grammar to communicate the intended message. . . .A child who has difficulty understanding either the verbal or the nonverbal message may not be able to participate appropriately in a conversation. . . . For example, classmates may become impatient or irritated when a child is unable to understand a joke (verbal) or to interpret facial expressions (nonverbal).

*Boyd v. Colvin,* 2014 U.S. Dist. LEXIS 56367, *13 (W.D. Ark 2014).

---

[9] Courts have recognized the importance of non-verbal cues in understanding the meaning and emotion of witnesses, a standard that is equally applicable to ordinary understanding between students and between students and teachers.  *Del Piano v. United States*, 575 F.2d 1066 (3d Cir. 1978)(court judge's demeanor of witness by noting "the physical appearance and demeanor; the tone, temper and rhythm of speech; the facial expressions, the hands, the revealing look into the eyes."); *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1072 (3d Cir. 1984) (including, among others, "[n]on-verbal communicating factors" such as"facial expression. . .gestures; eye contact; and smiles."); *United States v. Boyles*, 57 F.3d 535, 547 (7th Cir. 1995); *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 148 (1994)("nonverbal cues can be better than verbal responses at revealing a juror's disposition"); *Courthouse News Serv. v. Yamasaki*, 312 F. Supp. 3d 844, 869 (C.D. Cal. 2018)(court refusing to close a hearing because "[e]ven if the hearing transcript had been released within 24 hours as planned, it wouldn't have enabled the public to, among other things, see facial expressions or hear tone.").

All of this — the non-verbal speech elements along with the actual ability to speak and associate, to develop and pursue friendships and relationships — is effectively lost to New Jersey schoolchildren under the Governor's masking orders that will be applied *only to schoolchildren* beginning at the start of school in September.

Executive Order 251 is not a minimal intrusion but is a wholesale deprivation of schoolchildren's rights and liberty interests that causes a near-complete suppression of student speech and association in the schools.

## II.   THE EXECUTIVE ORDER CONTAINS NO SUBSTANTIVE FINDINGS TO JUSTIFY THE IMPOSITION OF THE MASKING MANDATE ON SCHOOLCHILDREN.

Executive Order No. 251 fails to contain any actual findings of fact to substantiate its directives but speaks in mere generalized terms to support the imposition of masking orders on New Jersey's 1.4 million schoolchildren.  Aside from a general reference to the claim that "the B. 1.617.2 ("Delta") variant, [is] more transmissible" and that CDC recommends masking for all schoolchildren (in itself a statement that is undocumented and not accompanied by reference to any medical or scientific study), the Executive Order's sole basis for this vast imposition on children is the following:

> [T]he State has experienced *significant upticks* in critical *COVID-19 metrics* over the past few weeks, including COVID-19 positive cases, the rate of transmission, spot positivity, and new hospitalizations, that warrant additional *precautions* in certain settings with a substantial number of unvaccinated individuals;

> Executive Order 251 at 3-4 [emphasis added].

The reference to "significant upticks" in "COVID-19 metrics" is a generalization with no objective criteria to identify *why* the order is now needed, what level of "upticks" triggered the

31

order or what standard will trigger its termination.   No objective number of increased COVID

cases, hospitalizations, deaths or any other "metric" is included in the order, for adults or

children, to explain why the schools mask mandate has now been re-imposed.  For example,

while the Order refers to "upticks" in "spot positivity" it gives not a single figure to identify the

threshold used for re-imposing such rules. Such vague and conclusory "findings" would never be

sufficient to support intrusive legislation of this nature from Congress or a legislature, let alone

in circumstances where a single state official declares the order without recourse to any public

hearing and where there is no public record to consult or test.  When such an order concerns and

impairs fundamental rights of more than 1.4 million people, it offends any notion of ordered

liberty.

New Jersey's Legislature never conveyed unlimited authority to the executive branch in

such matters.  The Health Powers Act, N.J.S.A., §26:13-2, et seq., empowers the Commissioner

of Health to issue such orders as are "necessary" to "prevent" transmission of disease:

> With respect to a declared state of public health emergency, the commissioner
> may take       all *reasonable and necessary* measures to prevent the transmission
> of infectious disease. . .
>
> N.J.S.A. §26:13-2 [emphasis added].

As is clear from the statute, the Legislature did not intend an unlimited power for the

Governor to act as he thinks "reasonable" but permitted only such measures that were

"reasonable *and necessary*" a formulation that, at minimum, requires a factual showing of

necessity not a vague reference to "significant upticks" in Covid "metrics". *Id.*  Any other

interpretation would mean an unlimited and arbitrary authority over the citizen without

legislative hearing or consideration.  Nor can any broader emergency power be found in New

32

Jersey's Constitution (1947) that gives no emergency authority to the Governor or the executive branch for health or any other reason.[10]

The Ninth Circuit has encapsulated the potential for abuse that goes with the unchained and unsubstantiated use of "emergency" powers:

> The exercise of emergency powers is particularly subject to abuse. Emergency decision-making is, by its nature, abbreviated; it normally does not admit participation by, or input from, those affected; judicial review, as this case illustrates, is often greatly curtailed or non-existent. Exigent circumstances often prompt actions that severely undermine the rights of citizens, actions that might be eschewed after more careful reflection or with the benefit of safeguards that normally constrain governmental action. *See generally* Karlin, 17 Sw. U.L. Rev. at 653-57.
>
> *Sinaloa Lake Owners Asso. v. Simi Valley*, 882 F.2d 1398, 1410 (9th Cir. 1989)[emphasis added].

Due process concerns arising from unrestrained emergency powers, *Sinaloa Lake, supra,* coupled with the absence of any state constitutional grant of emergency authority, see n.10, and the Legislature's mandate that such powers be used only as "reasonable *and necessary*", N.J.S.A., §26:13-2, along with the Supreme Court's admonition that where fundamental rights are disturbed there must be a "reasoned analysis" as to a "close' and "substantial" relation between the state interest and the method of regulation, *Ramos,* supra, at 183-185, citing *Miss. Univ. for Women v. Hogan, supra*, 458 U.S. at 725-726, and the requirement that such regulation

---

[10] Only four references to "emergency" appear in the Constitution.  All are ministerial and none convey any power to the Governor or to any other state officer.  *See e.g.* Article IV, Sec. VI, Clause 4 (Legislature may appoint successors to public office "in periods of emergency resulting from disasters caused by enemy attack,. . ."); Art, IV, Sec. IV, Cl. 6 (where "by vote of three-fourths of all its members,. . ., that a bill or joint resolution is an emergency measure, . . . [it] may proceed forthwith from second to third reading."); Art. V, Sec. I, Cl 14(f) (providing that "no emergency resolution need be adopted for the reenactment of any bill at a special session of the Legislature."); Art. VIII, Sec. 2, Cl 3(e) (providing that the rules as to borrowing do not apply "to emergency caused by disaster or act of God,. . .").

be "essential" to the governmental interest, *United States v. O'Brien*, 391 U.S. at 377, all speak to the need for the Governor to document and substantiate *factually* the basis for the exercise of emergency power in Executive Order 251.  This he has failed to do.

It is precisely because use of "emergency powers is particularly subject to abuse", *Sinaloa Lake, supra,* that the Health Powers Act, required that the Governor impose only such measures that are "reasonable *and necessary*". N.J.S.A., §26:13-2.  Instead of meeting this standard, the Executive Order asserts that such "upticks. . .warrant additional *precautions* in certain settings with a substantial number of unvaccinated individuals;. . ." Executive Order 251 at 4 [emphasis added].  A "precaution" is hardly the showing of "necessity" the Legislature mandated as the basis for unilateral action nor is it a showing that such regulation as to schoolchildren is "essential", as the *O'Brien* analysis would require.

An "emergency" order must have sufficient factual rigor so that the public and the judiciary can subject it to scrutiny, a concern that is especially important where the Governor is acting outside of ordinary legislative or administrative process and there is no opportunity for public comment nor is there an administrative record that can be tested.  Executive Order 251 presents a classic case in which "[e]xigent circumstances… prompt actions that severely undermine the rights of citizens, actions that might be eschewed after more careful reflection or with the benefit of safeguards that normally constrain governmental action." *Sinaloa Lake, supra,* 882 F.2d at 1410.

For all of these reasons, Executive Order 251 fails basic due process concerns and should be vacated and permanently enjoined.

III.     **EQUAL PROTECTION IS VIOLATED BY THE GOVERNOR'S TARGETING OF SCHOOLCHILDREN AND TEACHERS WHILE LEAVING ALL OTHER NEW JERSEY RESIDENTS FREE OF ANY RESTRAINTS AT ALL OTHER PUBLIC AND PRIVATE LOCATIONS.**

Equal protection attaches when government burdens or eliminates protected rights from one class of persons while failing to impose such burdens on others "in the absence of an adequate reason to distinguish between them." *Ramos, supra*, 353 F.3d at 174.  In *Ramos,* the Second Circuit applied intermediate scrutiny to a content-neutral curfew on children, holding that children's fundamental interests in free movement and association required protection unless the State can demonstrate a "close" and "substantial relationship" to an important governmental interest and has applied the narrowest means necessary to achieve that goal.  *Id.* at 183-184, citing *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 100 S. Ct. 1540 (1980)(explaining the application of intermediate scrutiny).

*Ramos* held that the State "carries the burden of proving "that close relationship [] to assure that the validity of a classification is determined through *reasoned analysis* rather than through the mechanical application of traditional, often inaccurate, assumptions." *Id., quoting Miss. Univ. for Women v. Hogan,* 458 U.S. 718, 725-726, 73 L. Ed. 2d 1090, 102 S. Ct. 3331 (1982)[emphasis as to "reasonable analysis" added by *Ramos*].[11] A "reasoned analysis" requirement demands far more than the Executive Order may be helpful in fighting disease or that masks are a good "precaution".  Where a regulation seeks to protect a content-neutral state

_____

[11] Citing the Supreme Court's decision in *Hogan*, 458 U.S. at 725-726, the court in *Ramos* agreed that "in judging the closeness of the relationship between the means chosen (the curfew on children), and the government's interest," *id*., three interrelated concepts must be considered: 1) the factual premises which prompted the legislative enactment; 2) the logical connection between the remedy and those factual premises; and 3) the breadth of the remedy chosen.

35

interest but impairs protected rights, as the masking order does as to schoolchildren, the State must show that such measure "is <u>essential</u> to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. at 377 [emphasis added].

First Amendment and equal protection concerns as to schoolchildren are subject to this same analysis. Certainly, the physiology of children and adults in schools is the same as the physiology of children and adults at other locations with similar (or even greater) densities and proximity of people, yet no orders have been imposed by the Governor on any other group or at any other place *except schoolchildren and teachers*.

Malls and restaurants, stores, bars, coffee shops, houses of worship, health clubs, catering halls and other locations, including concert halls, casinos, clubs and public meetings such as planning and zoning boards, are now fully open and contain large numbers of people free to sit unmasked in close proximity for hours on end, but none are subject to masking or other restraints, regardless of vaccination status. At weddings, bar and bat mitzvahs and the like, dozens or hundreds of guests, including children, may dance in close quarters for hours with no requirement of masking or other restrictions. *Only schoolchildren and teachers are subject to renewed masking rules*.

Executive Order 253 notes that 5.4 million people in New Jersey have been vaccinated, meaning that almost half the 9.3 million residents of New Jersey are *still* unvaccinated,[12] yet all are permitted complete freedom to congregate unmasked and unseparated, while only schoolchildren and teachers are required to undergo masking. Thus, the fact that younger schoolchildren cannot yet be vaccinated cannot explain the discrimination underlying Executive

---

[12] In 2020 New Jersey's population was 9,288,994.  https://www2.census.gov/programs-surveys/decennial/2020/data/apportionment/apportionment-2020-table02.pdf

Order 251 since the Governor's orders leave millions of unvaccinated adults free to mix anywhere in New Jersey without restraints or masking.  To meet constitutional muster, the State must demonstrate the "essential" need for such discrimination, *O'Brien, supra,* a standard it logically cannot satisfy if it is leaving millions of people, vaccinated and unvaccinated, free to mix anywhere in the State without the masking restraint imposed on schoolchildren.

Equal protection arises where government treats groups discriminately. *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291, 365-366 (2014)("We often think of equal protection as a guarantee that the government will apply the law in an equal fashion—that it will not intentionally discriminate against minority groups."). Whether viewed as a deprivation of fundamental rights or a violation of equal protection, the fundamental focus must be on proof of a "reasoned analysis" *Ramos* at 185, quoting *Hogan*, 458 U.S. at 725-26, a test that requires the State to demonstrate through evidence a substantial or compelling governmental interest to justify the burden on children's fundamental rights while leaving all other groups untouched by Covid restraints.  Since no evidence has been identified in any executive order that there is a demonstrably greater risk of infection within public schools than other places of public gathering where the State allows unlimited numbers of unvaccinated persons to meet and mix without masking, neither equal protection concerns or due process can be deemed satisfied by Executive Order 251.

**CONCLUSION**

For the foregoing reasons, it is respectfully requested that permanent injunctive relief be entered directing that Executive Order 251 be vacated or that the enforcement of such order be stayed as of September 10, 2021, the first day of school, pending hearing on the merits.

Respectfully submitted,

By:   */s/Bruce I. Afran*

Bruce I. Afran, Esq.
*Counsel for Plaintiffs*