# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **CYNTHIA STEPIEN on behalf of herself and her minor child; STAMATIA DIMATOS SCHRECK, on behalf of herself and her three minor children; RYAN CODY, on behalf of himself and his minor child J.C.; ELLY FORD on behalf of herself and her minor child A.F.; GABE MCMAHON; M.F.; M.K.N.; K.B.; B.W.; L.R.; J.V.P.; V.P.; D.M.; B.M.; A.M.; and ALL OTHERS SIMILARLY SITUATED,**<br><br>     **Plaintiffs,**<br><br>     **v.**<br><br>**PHILIP D. MURPHY, Governor; ANGELICA ALLEN-McMILLAN, Commissioner of Education; JUDITH M. PERSICHILLI, Commissioner of Health,**<br><br>     **Defendants.** | Civ. No. 21-CV-13271 (KM) (JSA)<br><br>**OPINION** |

## KEVIN MCNULTY, U.S.D.J.:

This matter comes before this court on the plaintiffs' motion for an Order to Show Cause as to Vacating or Staying Executive Orders 251 and 253. (DE 12.)[1] Plaintiffs seek a preliminary injunction vacating the executive orders

---

[1]    Certain citations to the record are abbreviated as follows:

    DE = docket entry in this case

    Mot. = Plaintiffs' Brief in support of Application for Permanent injunctive relief (DE 12-2)

    Opp. = Defendants' brief in opposition to Plaintiffs' motion for preliminary injunctive relief (DE 24)

("EOs") insofar as they require students, staff, and visitors to New Jersey schools to wear face masks while inside school buildings.

It is tempting to view the question before the court as "Should students and others be required to wear masks in school buildings?" That is a temptation a court must resist. In general, the wisdom of such public policies is not an issue for the courts, but for the people's elected representatives. The court's role is far more modest.

That said, the U.S. Constitution does impose limits on governmental action, which a court is bound to enforce. Plaintiffs assert that the in-school mask mandate exceeds those limits. They invoke the Equal Protection clause. But where a rule does not implicate a suspect classification, for example, race or ethnicity, the Court's authority to second-guess policy decisions is very limited. Plaintiffs also invoke the First Amendment. But where a rule incidentally affects speech for reasons not related to its content, it may be allowed as a permissible "time, place, and manner" regulation. In short, constitutional provisions designed primarily to prohibit unequal treatment of minorities and suppression of unpopular messages have some application here, but that application is limited.

The United States Supreme Court instructs us that "schools must teach by example the shared values of a civilized social order." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). One such value is that, when faced by a common catastrophe like a pandemic, we must all make some sacrifices to protect ourselves and our more vulnerable neighbors. Citizens on both sides of this issue surely have in common a concern for our children's welfare, although they may differ as to how that goal should be pursued. And all must admit that these EOs impose some hardship upon those who are required to wear masks while in school buildings. Considered apart from their health

---

Amicus Br. = Brief of Amici Curiae New Jersey Chapter of The American Academy of Pediatrics and American Academy of Pediatrics in Opposition to Plaintiffs' Motion For Preliminary Injunctive Relief (DE 41-1)

benefits, the masks may also be seen to have educational disadvantages. Nevertheless, the decision to impose the in-school mask mandate is a rational one, and its burden on students and others is easily justified by the government's interest in controlling the spread of COVID-19 while maintaining in-person schooling.

I hold that the government acted within broad constitutional bounds when it enacted the in-school mask requirement that is challenged here. The motion for a preliminary injunction is denied.

## I.    BACKGROUND

In late 2019, a novel coronavirus, SARS-CoV-2, which causes the disease known as COVID-19, began to circulate in China and quickly spread around the world. Beginning in March 2020, state and local governments in the United States began issuing emergency orders to reduce the spread of COVID-19. In New Jersey these orders led many non-essential businesses to shut down and schools to shift to remote learning, often *via* Zoom or other video applications. To date, well over a million New Jerseyans have contracted COVID-19 and more than 25,000 have died. NJ COVID-19 Dashboard, Cases and Trends, https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml. Nationally, there have been more than 48 million confirmed cases of COVID-19 and 780,000 deaths. New York Times, Coronavirus in the U.S., https://www.nytimes.com/interactive/2021/us/covid-cases.html. Just since defendants filed their brief on September 8, 2021, nearly 150,000 Americans have died from COVID-19. (Opp. at 1.) Even after highly effective vaccines became widely available in the Spring of 2021, COVID-19 continued to spread, because of the emergence of new, more virulent variants, including the Delta variant, and because a large proportion of the population remains unvaccinated. (DE 24-9, Exs. 30–38.)

Since the beginning of this school year, more than 25,000 K-12 students in New Jersey have tested positive for COVID-19. NJ COVID-19 Dashboard, School-Related Dashboards,

3

https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml One study found that among children between the ages of 5 and 14, COVID-19 was the sixth leading cause of death in August and September 2021. JARED ORTALIZA, KENDAL ORGERA, KRUTIKA AMIN, AND CYNTHIA COX, *COVID-19 continues to be a leading cause of death in the U.S. in September 2021*, Peterson-KFF Health System Tracker, https://www.healthsystemtracker.org/brief/covid19-and-other-leading-causes-of-death-in-the-us; *see also* JEFFERSON JONES, *Epidemiology of COVID-19 in Children Aged 5 – 11 years*, CDC ACIP Meeting, Nov 2, 2021, https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-11-2-3/03-COVID-Jefferson-508.pdf. Nearly one third of all child cases of COVID-19 nationally occurred in the three-month period between August 13 and November 11, 2021, driven by the resumption of in-person school and the more contagious Delta variant. (Amicus Br. at 4 (citing CHILDREN'S HOSP. ASS'N & AM. ACAD. OF PEDIATRICS, *Children and COVID-19: State Data Report* at Appx. Tab. 2A, Nov. 11, 2021),
https://downloads.aap.org/AAP/PDF/AAP%20and%20CHA%20-%20Children%20and%20COVID-19%20State%20Data%20Report%2011.11%20FINAL.pdf).)

Remote learning was unpleasant for many students and teachers, and extremely inconvenient for working parents. Studies have shown that it is an inferior method of instruction as compared to in-person education. (DE 24-12, Ex. 41.) Thus, as the 2021–22 school year approached, New Jersey Governor Phil Murphy sought to have students return to in-person schooling while also taking steps to inhibit or prevent the spread of the COVID virus and its variants. To achieve that goal, he issued EO 251 on August 6, 2021. EO 251 emphasized the importance of in-person learning, the lack of availability of vaccines for children under 12 years of age,[2] and the danger posed by the Delta

---

[2]     Very recently, in November 2021, vaccines were approved for children between the ages of 5 and 11. CDC, *CDC Recommends Pediatric COVID-19 Vaccine for Children 5 to 11 Years*, Nov. 2, 2021, https://www.cdc.gov/media/releases/2021/s1102-

variant. With narrow exceptions, it mandated that everyone entering a school building, including but not limited to students, must wear a face mask. (EO 251, at 2–6; DE 24-1 ¶ 75).[3] At the time that EO was issued, more than 4 million children across the country had been infected with COVID-19, more than 17,000 children had been hospitalized, and 371 children had died from the disease. (DE 24-8, Ex. 24.)

On July 2, 2021, plaintiffs filed a complaint in this court, requesting that I enjoin the executive orders.[4] (DE 1.) A first amended complaint was filed a week later. (DE 2.) On August 6, 2021, Governor Murphy issued EO 251, renewing the mask mandate in the state's schools. (DE 11 ¶ 26.) On August 26, 2021, Murphy issued a supplementary EO, partially related to masks in schools, numbered EO 253. (Mot. at 36.) Plaintiffs filed a second amended complaint on August 30, 2021. (DE 11.) That same day, plaintiffs also sought an Order to Show Cause as to Vacating or Staying the EOs. (DE 12.) I ordered the parties to brief the issues and appear for oral argument *via* videoconference on September 9, 2021. (DE 16.) Based on the parties' briefs, factual submissions, and oral argument, I denied the plaintiffs' request insofar as it sought a temporary restraining order immediately suspending the operation of the EOs. (DE 12, 24, 25.)

After the initial hearing, I ordered expedited discovery, and plaintiffs moved to compel the production of certain documents. (DE 28–30.) I denied the motion to compel, in part as unnecessary (because the defendants had complied) and in part because the material sought was protected by deliberative process privilege. (DE 36.)

---

PediatricCOVID-19Vaccine.html. Whether widespread vaccination will lead to a change of policy regarding masking in schools remains unsettled.

[3]     Later in August 2021, Murphy issued EO 253, also challenged by plaintiffs. That EO dealt partially with masking but did not make any policy changes that are relevant to the analysis of this case, so I focus on EO 251.

[4]     Technically, injunctive relief on a Section 1983 claim would be directed against an official charged with enforcing the executive order in that person's official capacity. *See generally Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

After the close of supplemental discovery on October 22, 2021, I permitted additional briefing to be submitted by November 23, 2021. (DE 38.) The American Academy of Pediatrics ("AAP") and its New Jersey chapter moved to file an amicus brief on November 19, 2021. (DE 41.) Plaintiffs filed a supplemental brief on November 23, 2021. (DE 45.) For responses to the AAP's motion to file an amicus brief, I set a deadline of Friday, December 3, 2021. (DE 44.) As of today, December 7, 2021, no responses have been filed. Plaintiffs' motion, insofar as it sought a preliminary injunction, is therefore fully briefed and ripe for decision.

## II.   PRELIMINARY ISSUES

### a.  Motion to file an Amicus Brief (AAP)

Federal Rule of Civil Procedure 29 allows a private *amicus curiae* to file a brief with leave of the court. Fed. R. Civ. P. 29(a)(2). On November 19, 2021, the AAP and its New Jersey chapter moved to file an amicus brief in this case. (DE 41.) The AAP is a national organization of pediatricians that has over 67,000 members and over the last year has advised governments and private organizations on best practices related to children and the COVID-19 pandemic. (DE 41-1 at 2.) The proposed amicus brief contains a great deal of information related to the use of masks in schools that is helpful to the Court as background. The AAP's motion to file its amicus brief (DE 41) and the related motions to appear *pro hac vice* (DE 42, 43) are therefore granted.

### b.  Motion to intervene

Federal Rule of Civil Procedure 24 governs intervention by nonparties. A party may intervene of right if it "(1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. (a). A private party may be given permission by the court to intervene if it "(A) is given a conditional right to intervene by a federal statute;

6

or (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24 (b).

Reginald Burgess, a resident of California, has moved to intervene in this case. (DE 6.) Burgess asks this court to "order masking nationwide at the command of the CDC as well as vaccines be taken by those capable." (DE 6 at 6.) Burgess cites *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). He identifies no federal rule or statute that provides a basis for him to intervene. He does not appear to have any particularized interest, but only a belief concerning the best means of preventing the spread of COVID-19. (DE 6 at 5.) His arguments and citations add nothing to what the parties and the Court could marshal on their own. Although a generalized interest in these issues is shared by many citizens, it does not provide a basis for intervention. Mr. Burgess's motion to intervene (DE 6) is therefore denied.

### III.   LEGAL STANDARD

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). In order to obtain a preliminary injunction, the moving party must show the following:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and

determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. "While each factor need not be established beyond doubt, they must combine to show the immediate necessity of injunctive relief." *Cmty. Servs. v. Heidelberg Twp.*, 439 F. Supp. 2d 380, 395 (M.D. Pa. 2006).

The decision to grant or deny a preliminary injunction is within the Court's discretion. *See Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Moreover, the primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994). Particular scrutiny is required where, as here, the plaintiff is asking the Court to order an affirmative act that changes the status quo. *See Bennington Foods LLC v. St. Croix Renaissance, Group LLP*, 528 F.3d 176, 179 (3d Cir. 2008) ("[W]here the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction."); *Acierno*, 40 F.3d at 653 ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity.").

## IV.   DISCUSSION

I first examine plaintiffs' Equal Protection claims and then examine their First Amendment claims. I hold that plaintiffs have not demonstrated that they are likely to succeed on the merits of either, and therefore deny their request for a preliminary injunction.[5]

---

[5]   Plaintiffs also bring claims asserting violations of New Jersey administrative law. (Mot. at 31–34.) These claims do not invoke federal law, and in any event would likely be barred by the Eleventh Amendment. *King v. Christie*, 981 F. Supp. 2d 296, 310 n.12 (D.N.J. 2013). It appears that plaintiffs are pursuing those claims in state court. Insofar as plaintiffs seek a preliminary injunction based on state administrative law, their request is denied.

### a. Equal Protection

Written in the aftermath of the Civil War to guarantee a meaningful measure of freedom to formerly enslaved people, the Fourteenth Amendment declares that no state can "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Over the past century and a half, the Supreme Court has defined the Equal Protection Clause as "a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). To quote *Ramos v. Town of Vernon*, upon which plaintiffs rely heavily, the Equal Protection Clause requires the state to "treat similarly situated individuals similarly, in the absence of an adequate reason to distinguish between them." 353 F.3d 171, 174 (2d Cir. 2003). From this basic rule, the inverse proposition follows: the state may treat differently situated individuals differently. *See Vacco v. Quill*, 521 U.S. 793, 799 (1997). *How* different or similar those situations must be is largely dictated by the level of scrutiny that the law requires.

The first step, then, is to determine what level of scrutiny is appropriate for these EOs. A court's level of scrutiny differs based on the nature of the classification. Strict scrutiny is appropriate if the challenged regulation targets a suspect class or burdens the exercise of a fundamental right.[6] *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982); *Artway v. Att'y Gen. of State of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996). In other cases, rational-basis scrutiny is appropriate; the challenged regulation "need only be rationally related to a legitimate government goal." *Artway*, 81 F.3d at 1267.

School children do not constitute a suspect class. *See West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1365 (10th Cir.), *cert. denied*, 531 U.S. 825 (2000); *Simmermon v. Gabbianelli*, 932 F. Supp. 2d 626, 631 (D.N.J.

---

[6] In equal protection analysis, it is the classification *itself* that must impinge on the fundamental right. *See Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213–14 (3d Cir. 2013), as amended (May 10, 2013). Plaintiffs also argue that the EOs directly infringe students' First Amendment rights to free speech and association. That claim I analyze separately at Section III.b, *infra*.

2013).[7] Similarly, the classification at the heart of the EOs—that masks are required within school buildings but are not required in many other locations—does not burden a fundamental right. The EOs do not, for example, distinguish between persons in public schools and persons in religious schools, a classification which could potentially burden the First Amendment right to free exercise of religion. Nor do the EOs differentiate between, *e.g.,* regions of the state, a classification which might carry a disparate racial impact. Rather, the EOs establish a blanket rule: With select exemptions, everyone who enters a school building in New Jersey must wear a mask while inside the building.

Because the mask mandate does not target a suspect class or burden a fundamental right, it receives not strict scrutiny but rational-basis review. *See W.S. by Sonderman v. Ragsdale*, 2021 WL 2024687, at *2 (N.D. Ga. May 12, 2021) ("Rational basis is the proper standard of review for the mask mandate. The mandate neither discriminates against a protected class nor infringes a fundamental right."). Rational-basis review in equal protection analysis "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (quoting *FCC v. Beach Communications*, Inc., 508 U.S. 307, 313 (1993)). Government actions analyzed under the rational basis standard are accorded a "strong presumption of validity" and should be upheld so long as there is a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller*, 509 U.S. at 319–20. Indeed, "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications*, 508 U.S. at 313; *see also Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993).

---

[7]     Although plaintiffs sometimes refer to the EOs imprecisely (Mot. at 31), the EOs do not apply solely to schoolchildren but rather to anyone entering a school building.

Here, plaintiffs do not identify a group of students that is treated differently despite being similarly situated. The EOs do not, for example, require masks at some schools but not others. Rather, plaintiffs object that those entering schools are required by law to wear masks, while many others, in non-school settings, are not.[8] (Mot. at 36–37; DE 45 at ix–xi.) Essentially, plaintiffs argue that such a school/non-school distinction is irrational in relation to the goal of fighting the spread of COVID. Defendants, for their part, put forward a number of arguments explaining why the requirement that masks be worn in schools is rationally related to the goal of slowing the spread of COVID. (Opp. at 11–15, 36–37.)

Defendants' arguments easily clear the relatively low bar of rational basis scrutiny. To put it another way, defendants are not required to win the policy debate in order to prevail here. There are numerous bases on which a policy maker could conclude that requiring students, teachers, staff, and visitors at New Jersey schools to wear masks is rationally related to the legitimate government purpose of inhibiting the spread of COVID-19. Any one of those explanations would be sufficient to uphold the EOs against an equal protection challenge, but I will discuss a few.

First, it is undisputed that masks help to reduce the spread of COVID-19 by blocking many of the virus-containing droplets expelled from the mouth and nose when breathing and speaking. (Opp. at 13–15; DE 24-1 ¶ 47; DE 24-14,

---

[8]    To be clear, the in-school mask mandate is not the only one. Plaintiffs concede that masks are also required by state law in, *e.g.*, day care and health care facilities. (*See* Mot at 1–3; EO 264 (September 20, 2021), https://nj.gov/infobank/eo/056murphy/pdf/EO-264.pdf.) State restrictions were previously far broader, at one point amounting to a lockdown, but were incrementally relaxed in many settings. *See* EO 241 (May 17, 2021), https://www.nj.gov/infobank/eo/056murphy/pdf/EO-241.pdf.

Less directly relevant here are federal mask mandates, such as those that apply on New Jersey Transit trains, *see* FTA, Federal Mask Requirement for Transit, https://www.transit.dot.gov/TransitMaskUp, and within federal courthouses, *see* United States District Court for the District of New Jersey, COVID-19: Orders, Procedures and Changes, https://www.njd.uscourts.gov/covid-19-orders-procedures-and-changes.

Exs. 53–59.) COVID-19 spreads more easily when people are in close proximity for extended periods of time, especially indoors, when there is little airflow. (DE 24-1 ¶ 45.) The Delta variant (and now the Omicron variant) spread more readily than earlier iterations of the SARS-CoV-2 virus. The Governor— accurately, as it turns out—anticipated that cases would increase in the months after he issued the EOs. (DE 24-9, Exs. 30–37; EO 251 at 2–3.)[9] In-person schooling—conceded to be a desirable goal—necessarily entails that students and teachers will be indoors, in close proximity, for extended periods of time. (DE 24-1 ¶ 51; DE 24-2 ¶ 50–51.) In addition, at the time the EO was issued, vaccines were not approved at all for children younger than twelve years of age. Thus, the single most effective means of reducing the spread of COVID-19 was unavailable, at least in the context of elementary school. (DE 24-1 ¶ 52.)[10] Consequently, both the CDC and the American Academy of

---

[9]    I do not suggest that this Court should be supervising state executive orders on an ongoing basis, following trends in the data. I cite figures only to confirm that the State's concerns have a basis in fact.

Currently, new cases statewide are trending sharply upward, and the rate of transmission (Rt) is at 1.26. New Jersey, COVID-19 Information Hub, https://covid19.nj.gov/ Both figures are well above the most recent, July 2021 lows.

Cases in K-12 schools are on a similar trend, both as to students and staff. The report dated November 28, 2021, showed 3,024 new student cases and 858 new staff cases for the preceding week. From September 1–November 25, 2021, weekly cases have approximately doubled to a rate of 2.66 cases/1000 students and 4.41 cases/1000 staff. https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml ("NJ COVID-19 School-related Dashboards") (last visited Dec. 7, 2021). For comparison, institutions of higher education had rates of .46 cases/1000 students and .78 cases/1000 staff. *Id.* ("Higher Education" tab).

[10]    Vaccinations for children from 5–11 years of age were only recently approved. Thus far, only a small percentage of those younger children have been fully vaccinated. (Amicus Br. at 15 (citing AAP, Children and COVID-19 Vaccinations Trends, at 6, Nov. 3, 2021); *see also* https://downloads.aap.org/AAP/PDF/Child%20Vaccinations%20Report%20US%20an d%20by%20State%20Nov%203%20final.pdf).) Nationally, full vaccination rates for children 5–11 are currently at 5.1%. CDC, Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States, https://covid.cdc.gov/covid-data-tracker/#vaccination-demographic. In New Jersey, as of December 1, 2021, 17% of children 5-11 and 73% of children 12-17 had received at least one dose. AAP, Children and COVID-19 Vaccinations Trends as of December 1 2021,

Pediatrics ("AAP") recommend universal masking in schools to reduce viral transmission during the school day. (DE 24-1 ¶ 71; Amicus Br. at 10 (citing AAP, *COVID-19 Guidance for Safe Schools*, https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/).) Studies of COVID transmission in schools have demonstrated that masks reduce the spread of COVID. (DE 24-1 ¶ 55–58; Amicus Br. at 13–14 (collecting studies).) The recommendation of masking by the CDC and AAP provides, even by itself, a rational basis for the EOs. I may assume *arguendo* that it is possible to disagree with that recommendation. Nevertheless, a reasonable public official or legislator could rationally opt to follow such authoritative guidance.[11]

Of course, another effective way to reduce COVID transmission in schools would be to close schools and return to remote learning, as was done earlier in the pandemic. Following the opinion of medical and child development experts, however, the governor determined that the educational superiority of in-person learning justified the incremental risk of COVID transmission—provided that proper precautions, such as masking, were taken to inhibit the spread of the disease. (Opp. at 11; EO 251 at 2; DE 24-2 ¶ 45–55; DE 24-12, Ex 41.) Thus, it was rational and permissible for the governor to

---

https://downloads.aap.org/AAP/PDF/Child%20Vaccinations%20Report%20US%20and%20by%20State%20Dec%201%20revised.pdf.

By comparison, people 18 and over have been fully vaccinated at a rate of 71.5% nationally, CDC, Covid Data Tracker, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total, and at a rate of 80.8% in New Jersey, CDC, COVID-19 Vaccinations in the United States, https://data.cdc.gov/Vaccinations/COVID-19-Vaccinations-in-the-United-States-Jurisdi/unsk-b7fc/data.

[11]    Governor Murphy has suggested that the school mask mandate may be permitted to expire in January 2022 if a sufficient number of students have been vaccinated. LILO H. STAINTON, *Murphy: Mask mandate goes if parents vaccinate kids*, WHYY, Nov. 9, 2021, https://whyy.org/articles/murphy-mask-mandate-goes-if-parents-vaccinate-kids/. Such a potential policy change, however, is not yet concrete and does not moot plaintiffs' claims in this case.

determine that in-person schooling with masks was preferable to another year of remote schooling.[12]

Plaintiffs argue that the mask mandate is underinclusive and therefore irrational.[13] (DE 45 at x–xi.) In short, they contend that it makes no sense for students, who are at relatively low risk of the most serious health impacts from COVID, to be required to wear masks while adults are free to congregate elsewhere, unmasked. (Mot. at 36–37; DE 45 at vi.) Preliminarily, it is important to note that the contrast is perhaps overdrawn. COVID, although more dangerous to older citizens, is nevertheless dangerous to children. One study has estimated that COVID-19 was, in recent months, the sixth leading cause of death for children between 5 and 14 years of age. ORTALIZA, et al., *COVID-19 continues to be a leading cause of death in the U.S. in September 2021.* Other studies conclude that a significant proportion of infected students suffer lasting health impacts, short of hospitalization and death. (DE 24-9, Ex. 29; Amicus Br. 5–6 (citing DANILO BUONSENSO, et al., *Preliminary evidence on long COVID in children*, Acta Paediatrica (2021),

---

[12]   Although the issue is not raised in the briefing, it appears that remote schooling also had a major effect on parents' (and perhaps especially mothers') workforce participation. *See* USHA RANJI, BRITTNI FREDERIKSEN, ALINA SALGANICOFF, AND MICHELLE LONG, *Women, Work, and Family During COVID-19: Findings from the KFF Women's Health Survey*, Kaiser Family Foundation, https://www.kff.org/womens-health-policy/issue-brief/women-work-and-family-during-covid-19-findings-from-the-kff-womens-health-survey/. Helping parents return to work and thus aiding economic recovery is also a rational basis to require in-person schooling with masks.

[13]   In making this argument plaintiffs cite *BST Holdings, L.L.C. v. OSHA*, 2021 U.S. App. LEXIS 33698, *20 (5th Cir., November 12, 2021), a recent decision staying the OSHA emergency temporary standard requiring COVID vaccinations at large employers. That decision, which has no binding authority on this court, is based primarily on federal constitutional law, administrative law, and the OSHA enabling statute. To that extent, it does not address the issues of the executive power of the governor of the state of New Jersey. Generally, that a regulation is underinclusive is extremely weak evidence that the problem it addresses does not exist, or is not an emergency. Almost every regulation with a bright line rule is both underinclusive and overinclusive. Although such bright line rules are sometimes arbitrary, they are necessary for effective administration of regulations. So long as the bright line is rationally related to a legitimate government goal, the regulation will be upheld under rational-basis review.

https://onlinelibrary.wiley.com/doi/10.1111/apa.15870 and HELEN THOMSON, *Children with long covid*, 249 New Scientist 10 (2021), https://www.sciencedirect.com/science/article/pii/S0262407921003031?via %3Dihub).) The EOs, however, are not meant only to protect children. Schools employ many teachers and staff members who are at higher risk of hospitalization and death from COVID and can contract it from children. What is more, many students live with older or immunocompromised family members who are also at higher risk of serious illness from COVID. (DE 24-14, Ex. 50.) So even if COVID-19 posed no danger at all to children, it could be rational to require masks in school to reduce secondary infections and protect more vulnerable people from illness.

On the underinclusiveness point, there are other factors that distinguish schools from other settings. Most importantly, education is compulsory. The government requires the vast majority of children under the age of 18 to spend hours each day at school, in close proximity to each other as well as to teachers and staff. As a result, the government takes on a particular responsibility for those children's safety, surpassing its general responsibility with respect to the citizenry at large. *See generally Frugis v. Bracigliano*, 177 N.J. 250, 268 (2003) ("The law imposes a duty on children to attend school.... While their children are educated during the day, parents transfer to school officials the power to act as the guardians of those young wards. No greater obligation is placed on school officials than to protect the children in their charge from foreseeable dangers.... Although the overarching mission of a board of education is to educate, its first imperative must be to do no harm to the children in its care.") In addition, relatively few children, especially those under twelve years of age, have been vaccinated against COVID-19, as compared to adult vaccination rates. *See* n.10, *supra*. It is thus rational for the state government to make separate and more stringent provision for those entering school buildings.

It is true, of course, that COVID is a serious problem outside of school, as well as inside. But where there is no reason to think that any distinction

drawn between the two is based on a suspect classification or hostility to the exercise of a fundamental right, we are in the rational-basis realm. In that realm, the government is free to address problems one at a time, or to concentrate its efforts where the need seems most critical. *See Beach Communications*, Inc., 508 U.S. at 316; *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976); *Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 876 (3d Cir. 2012).

I again emphasize that the court's task is to identify a rational basis for the EOs, not to second-guess or usurp elected officials' policy decisions regarding acceptable levels of risk or the tradeoffs between health concerns and other priorities. Because there are multiple rational bases for the in-school mask mandate, the plaintiffs are not likely to succeed on the merits of their equal protection claim. I decline to issue a preliminary injunction on equal protection grounds.

### b. First Amendment

Plaintiffs next argue that the in-school mask mandate infringes schoolchildren's First Amendment right to freedom of speech. As discussed below, because the mask mandate potentially implicates the First Amendment, I apply intermediate scrutiny to the EOs and analyze them as a time, place, and manner restriction. I hold that the burden placed on First Amendment rights by the mandate is justified by the compelling and content-neutral government interest in stemming the spread of COVID-19; that the mandates are narrowly tailored to serve that interest; and that they leave open adequate alternative channels of communication.

### i.   Students and the First Amendment

Before reaching the heart of the time, place, and manner analysis, I generally survey the place of students' rights in our First Amendment jurisprudence.

In 1969, ruling in favor of students who were suspended for wearing black armbands to protest the ongoing war in Vietnam, the Supreme Court stated that schoolchildren are "persons under our Constitution" and

16

"possessed of fundamental rights which the State must respect." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) (internal quotation marks omitted). Declaring that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," the Court in *Tinker* set the basic standard for in-school student speech that has remained largely intact for a half century. *Id.* at 506; *see also Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 794 (2011) ("Minors are entitled to a significant measure of First Amendment protection.") (cleaned up). In the intervening years, the Court has clarified that some categories of student speech are not protected by the First Amendment and may be regulated even on the basis of content.[14] Generally, however, peaceful student speech that does not "materially disrupt[] classwork or involve[] substantial disorder or invasion of the rights of others" is protected. *Tinker*, 393 U.S. at 513.

The Supreme Court has made it clear, then, that students enjoy First Amendment protections. The Court has emphasized, however, that students' First Amendment rights, particularly on campus, are narrower than those of adults. Recently the Court reiterated that "courts must apply the First Amendment 'in light of the special characteristics of the school environment,'" *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2044 (2021) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)). One of those special characteristics is that schools stand *in loco parentis. Id.* at 2045 (citing *Bethel Sch. Dist. v. Fraser*, 478 U.S. at 684).

---

[14]    In a recent decision, the Court outlined those permissible content-based restrictions on student speech as follows:

> This Court has previously outlined three specific categories of student speech that schools may regulate in certain circumstances: (1) "indecent," "lewd," or "vulgar" speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes "illegal drug use"; and (3) speech that others may reasonably perceive as "bear[ing] the imprimatur of the school," such as that appearing in a school-sponsored newspaper.

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2045 (2021) (citations omitted).

17

In its most recent case to address student speech, *Mahanoy Area School District*, the Court emphasized that the special characteristics of schools "call for special leeway when schools regulate speech that occurs under its supervision." *Id.* In that case, a student profanely expressed negative feelings about the school's cheerleading program in a private Snapchat posted from a location outside of school. The Supreme Court affirmed the Third Circuit's decision that the school had violated the First Amendment by punishing the student, but held that *Tinker*'s reduced standard of First Amendment protection may apply off of school grounds as well as on. *Id.* at 2045–46.[15] While the boundaries are not entirely clear, the Court's decision does yield one definite principle: a clear rejection of Third Circuit case law that had held students' First Amendment rights were "coextensive" with those of adults. *Id.*; *B.L. by & through Levy v. Mahanoy Area Sch. Dist.*, 964 F.3d 170, 178 (3d Cir. 2020) (quoting *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 932 (3d Cir. 2011)), *aff'd with different reasoning*, 141 S. Ct. 2038 (2021); JENNY DIAMOND CHENG, *Deciding Not to Decide:* Mahanoy Area School District v. B.L. *and the Supreme Court's Ambivalence Towards Student Speech Rights* 74 VAND. L. REV. EN BANC 511, 518 (2021).

By allowing schools to punish a student for speech that would undeniably be protected by the First Amendment if uttered by an adult, the Court reaffirmed longstanding law that the First Amendment provides lesser protection for students than for adults. The suggestion by plaintiffs that courts

---

[15]     The Court did not equate on-campus and off-campus speech, however. It mentioned "three features of off-campus speech that often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech." *Id.* at 2046. These features included the fact that schools rarely act *in loco parentis* in relation to off campus speech and the Court stated that schools will have "have a heavy burden to justify intervention" regarding out-of-school political or religious speech and noted that schools should protect students who expressed unpopular ideas. *Id.* The knotty definitional issues posed by communication "on" or "off" campus, especially in the internet age, are not germane here, but are relevant as background.

must give *greater* protection to the free speech rights of students is diametrically opposed to precedent and therefore must be rejected. (Mot. at 14.)

In short, although schools are allowed to impose rules and punishments that would violate the First Amendment if applied to adults, students retain free speech rights, and can prevail against state actions that restrict those rights.

### ii.    Masks and Speech

Plaintiffs argue that the EOs violate students' First Amendment right to freedom of speech because masks interfere—to some degree—with the physical ability to speak, muffling the voice, "muzzl[ing]" schoolchildren, and obscuring facial expressions in a way that impairs their participation in the educative process. (Mot. at 16.) The government responds that the mandate does not implicate the First Amendment at all, and should be considered only as a regulation of non-expressive conduct.[16] (Opp. at 21–25.)

Defendants cite a number of cases in which courts across the country have upheld mask mandates against constitutional challenges. (*Id.* at 21.) Those cases are suggestive, but not entirely on point; almost none of those other plaintiffs argued, as plaintiffs do here, that a mask mandate physically *restricts* speech. *See*, *e.g.*, *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 237 (D. Md. 2020) (considering and rejecting an argument that a state mask mandate *compelled* speech because the wearing of a mask had expressive content).[17] Relatedly, defendants cite several Supreme Court precedents that construe the First Amendment in relation to expressive conduct rather than pure speech. (Opp. at 21–22.) The EOs, they argue, do "not burden any First Amendment conduct whatsoever" because the First Amendment only protects "conduct that is inherently expressive," which mask wearing is not. (*Id.* at 21

---

[16]    In the alternative, defendants argue that the EOs survive intermediate scrutiny. (Opp. at 25–28.)

[17]    Still farther afield are cited cases in which religious schools argued that the wearing of masks inherently violated their freedom of worship or the tenets of their faith. No such claim is made in relation to the EOs here, and I do not discuss it.

(quoting *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006)).) Those cases, however, do not directly address the particular claims made here; these plaintiffs do not claim that mask wearing is expressive conduct.[18] Rather, the plaintiffs argue primarily that a mask physically interferes with actual speech—talking in the usual sense—as well as communicative facial expressions. Many, this Court included, have experienced the need to repeat themselves or to speak more loudly and clearly to be understood through a mask. The ability to speak and have one's voice heard is protected by the First Amendment. I assume *arguendo,* then, that laws which burden this ability, whether purposely or incidentally, trigger some level of scrutiny under our First Amendment jurisprudence.[19]

---

[18]  To determine if conduct is expressive, courts must consider whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." (*Id.* at 21–22 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).) *See Rumsfeld v. FAIR, supra* (law schools threatened with a denial of federal funding for prohibiting military recruiters); *Texas v. Johnson, supra* (flag burning).

[19]  I make that concession *arguendo* in plaintiffs' favor, but the matter is not free from doubt.

For example, in one case that defendants cite for the proposition that the mask mandate does not implicate the First Amendment, the court in fact applied intermediate scrutiny to the governor's order closing movie theaters, although it upheld the order. *Nat'l Ass'n of Theatre Owners v. Murphy*, 2020 WL 5627145, at *10–*11 (D.N.J. Aug. 18, 2020).

On the other hand, in *L.T. v. Zucker*, 2021 WL 4775215 (N.D.N.Y. Oct. 13, 2021), the court considered a First Amendment challenge to an in-school mask mandate like the one here. Those plaintiffs, like these, argued that masks had a muffling effect, that they hid facial expressions, and so on. The *L.T.* court agreed with the position taken by defendants here that the First Amendment is not implicated:

> However, even if the mask mandate does prevent facial expressions from being seen and forces Plaintiffs to alter their vocal modulations, the mandate still would not likely be found to constitute an incidental burden on speech. The speech that is allegedly infringed is not sufficiently intertwined with the regulated conduct, and even if the two were sufficiently connected, the speech is not sufficiently particularized to fall under the First Amendment's protective umbrella.

*Id.* at *5. As for the obstruction of facial expressions, *L.T.* noted that clear masks are available. I have used them in my own courtroom to facilitate confrontation of witnesses. *See also* n.22, *infra*.

20

Plaintiffs then overreach, however, in their interpretation of the scope of First Amendment rights. At its broadest, plaintiffs' argument embraces the idea that there is a First Amendment right to untrammeled social communication during school.[20] To make this argument, plaintiffs rely heavily on a single phrase from *Tinker*: "personal intercommunication among the students." (Mot. at 14–16.) By removing this phrase from its context, plaintiffs greatly exaggerate the constitutional protection given to student interactions at school.

That omitted context is as follows. The Court in *Tinker* defined "personal intercommunication" as distinguished from communication in the classroom, but did not suggest that personal intercommunication was the same as purely social communication. In full, the relevant paragraph reads as follows:

> The principle of these cases is *not confined to the supervised and ordained discussion which takes place in the classroom*. The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. *Among those activities is personal intercommunication among the students*. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process. *A student's rights, therefore, do not embrace merely the classroom hours*. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, *he may express his opinions, even on controversial subjects like the conflict in Vietnam*, if he does so without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others. But conduct

---

*L.T.* also rejected an equal protection challenge, similar to the one here, on the basis of the alleged arbitrariness of the imposition of a mask mandate on schools but not certain other, allegedly comparable facilities.

[20]    Plaintiffs use the same set of arguments to assert that the mask mandate also violates students' First Amendment right of association. Plaintiffs, however, do not plausibly allege that the right to association in school, assuming such a right exists, is violated by mask requirements. *See Gruenke v. Seip*, 225 F.3d 290, 308 (3d Cir. 2000); *Denis v. Ige*, 2021 WL 1911884, at *11 (D. Haw. May 12, 2021) (citing *Oakes v. Collier Cty.*, 515 F. Supp. 3d 1202, 1215 (M.D. Fla. 2021)). Because I find that the freedom of speech argument is far more directly applicable than the freedom of association argument, and because the analyses substantially overlap, I focus my attention on the freedom of speech argument.

> by the student, in class or out of it, which for any reason—whether
> it stems from time, place, or type of behavior—materially disrupts
> classwork or involves substantial disorder or invasion of the rights
> of others is, of course, not immunized by the constitutional
> guarantee of freedom of speech.

*Tinker*, 393 U.S. at 512–13 (cleaned up; emphasis added). In short, "personal intercommunication" refers to the type of First Amendment activities that students can engage in during lunchtime, between classes, and before or after school. The classroom is not the lunchroom, of course, and the permissible level of communication may differ as between the two. Likewise, the school's authority to require that students be respectful, or refrain from noisy chatter, does not imply that the school is free to suppress political or social points of view. Overall, however, *Tinker* dictates that students' rights are subject to regulation "in light of the special characteristics of the school environment." *Mahanoy*, 141 S. Ct. at 2044.[21] There is no support in the case law for the proposition that students have a First Amendment right to speak with one another purely socially, with no "muffling" or other restrictions, while at school. And within the classroom, of course, speech at inappropriate times or about inappropriate topics can be suppressed. *Mahanoy*, 141 S. Ct. at 2050 (Alito, J., concurring) (citing *Kuhlmeier*, 484 U.S. at 279.) Even outside the classroom, schools are permitted to give students detention, thus preventing them from communicating with their friends; to mandate a "quiet lunch"; to assign

---

[21]   None of the "personal intercommunication" cases cited by plaintiffs involve purely social communication. Rather, all such cases involve students who wished to engage in political or religious speech, for example, by handing out flyers or tracts. *See, e.g.*, *Slotterback By & Through Slotterback v. Interboro Sch. Dist.*, 766 F. Supp. 280, 293 (E.D. Pa. 1991) (handing out religious tracts); *Morgan v. Swanson*, 659 F.3d 359, 369 (5th Cir. 2011) (handing out pencils to classmates that read "Jesus loves me this I know for the Bible tells me so"); *Gillman ex rel. Gillman v. Sch. Bd. for Holmes Cty., Fla.*, 567 F. Supp. 2d 1359, 1362 (N.D. Fla. 2008) (wearing clothes with pro-homosexuality-acceptance messages). Plaintiffs characterize *Morgan v. Swanson* as a case about a half-birthday party (Mot. at 21), but the issue in that case was whether the student could pass out the "Jesus loves me" pencils at the half-birthday party, not whether she could hold a purely social half-birthday celebration.

students to classes that separate them from their friends; and even punish students for using sexual innuendo in a speech. *Fraser*, 478 U.S. 675.

Because schools can restrict speech and activities that might be protected by the First Amendment for adults or in a public setting, plaintiffs' citations to cases regarding loitering laws and curfew ordinances are not persuasive. *See Ramos*, 353 F.3d 171 (holding that curfew ordinance violated the equal protection rights of juveniles); *Sawyer v. Sandstrom*, 615 F.2d 311 (5th Cir. 1980) (holding that an anti-loitering ordinance unconstitutionally overbroad); *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048 (7th Cir. 2004) (holding that curfew law violated juveniles' free expression rights). The Fifth Circuit's opinion in *Sawyer* provides a good illustration of the reasons that those cases are inapposite. There, the Fifth Circuit stated that "'[t]he rights of locomotion, freedom of movement, to go where one pleases, and to use the public streets in a way that does not interfere with the personal liberty of others are implicit in the first and fourteenth amendments." *Sawyer*, 615 F.2d at 316 (quoting *Bykofsky v. Borough of Middletown*, 401 F. Supp. 1242, 1254 (M.D. Pa. 1975), *aff'd without opinion*, 535 F.2d 1245 (3d Cir.), *cert. denied*, 429 U.S. 964 (1976)). Yet that formulation is self-evidently inapplicable to schools. Schools are allowed to restrict students' freedom of movement; they may require students to arrive at school on time and remain on campus during the school day. No "right to locomotion" on the public streets is thereby infringed. All in all, plaintiffs have not established that the EOs directly violate any recognized First Amendment right to purely social "personal intercommunication" within the school environment.

The EOs, while they may impinge upon the physical act of speaking, make no distinctions based on the message being expressed. There is no indication, and plaintiffs do not argue, that the EOs are based on hostility to expression of any particular message or point of view. The EOs are therefore content-neutral, and I apply (at most, *see* n.19, *supra*) intermediate scrutiny to them. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Clark v. Cmty.*

*for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Because I find that the EOs burden First Amendment rights only incidentally, they are best analyzed as a regulation of the time, place, and manner of New Jerseyans' speech while inside school buildings. To stand, regulations analyzed under that intermediate scrutiny standard must (1) serve a substantial government interest unrelated to the content of speech; (2) be "narrowly tailored to serve" that interest; and (3) "leave open ample alternative channels for communication of the information." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). That three-part standard is easily met.

First, there are two substantial and related underlying government interests. As the U.S. Supreme Court has held, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam). In addition, New Jersey has a substantial interest in the state's students receiving in-person education, which studies have shown to be superior to remote education. (Opp. at 26.) At the intersection of those two substantial government interests sits the requirement of in-person schooling with masks. Masks have been shown to help prevent the spread of COVID within schools and thus within the broader community, and also to help protect teachers and staff members who are more likely than children to experience serious illness. (DE 24-1 ¶ 55–58; DE 24-14, Ex. 50.) They help make safe, in-person schooling possible.

Second, the mask mandate is narrowly tailored to serve those two related government interests. "[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Rock Against Racism*, 491 U.S. at 799. A broader way to prevent COVID transmission would be to close schools and require remote learning, cutting off in-person interaction altogether. Instead, the governor chose to open the schools but have those entering school buildings wear masks. As noted above, masks are a low-cost, effective way to prevent the spread of COVID. That is not to say, of course, that

the negative educational and social experiences of students, attested to in plaintiffs' affidavits, do not exist. And there is, of course, real discomfort associated with wearing masks all day. Legitimate government actions, however, are not required to be costless to be narrowly tailored. There is no evidence that requiring masks causes significant short- or long-term harm—or at least no evidence sufficient to permit this Court to displace State officials' policy judgments. (Amicus Br. at 16–19 (citing AAP, *Do Masks Delay Speech and Language Development?*, https://healthychildren.org/English/health-issues/conditions/COVID-19/Pages/Do-face-masks-interfere-with-language-development.aspx and ASHLEY L. RUBA & SETH D. POLLAK, *Children's emotion inferences from masked faces: Implications for social interactions during COVID-19*, PLoS One (2020), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243708).) I find that the EOs' mask mandate is narrowly tailored to achieve the twin goals of preventing the spread of COVID and maintaining in-person education.[22]

Third, the EOs leave open sufficient alternative channels of communication. To begin with, the EOs impose no restrictions at all on students' speech or activities while outside of school, as plaintiffs acknowledge. (DE 45 at v–vi.) Plaintiffs claim that "schools are *the* forum in which children seek (and obtain) conversation, friendship, dating, exchanges of ideas and association with others." (Mot. at 20, emphasis in original.) Many young people, however, find joy, conversation, romance, and friendship outside of school. Nothing in the EOs affects their ability to do so. Plaintiffs seek to analogize the schools to the quintessential public forum: "[T]o the child, school is similar to

---

[22]    The EOs' exceptions also evidence its narrow tailoring. EO 251 exempts from the mask mandate disabled students whose individualized educational programs precludes the use of a mask and allows any student to remove the mask when wearing it would be dangerous to health (*e.g.*, in extreme heat) or when performing a task that cannot be performed safely with a mask. EO 251 at 4–5. In addition, clear masks are available, and may be particularly advisable for speech therapists and those teaching students who are hearing-impaired. (Opp. at 15; DE 24-15, Ex. 63.)

the public streets for an adult." (Mot. at 21.) For the reasons stated above, the analogy is flawed; schools do not correspond to the wide-open forum of a public street. (And of course, the public streets are available to students themselves at other times of day.)

Common experience suggests that students, when masked, nevertheless remain free to talk, gesticulate, and otherwise make themselves understood; to be "muffled" is not to be gagged. What is more, students are able to communicate in many ways other than unmasked, face-to-face conversation. They are free to text, tweet, Snapchat, and so on (hopefully not during class). The EOs, then, do not deprive them of their ability to communicate, generally; they only make it marginally more difficult to communicate face-to-face while in school.

State and local governments have long exercised extraordinary powers to stop the spread of deadly disease. *See* WILLIAM J. NOVAK, *The People's Welfare: Law and Regulation in Nineteenth-Century America* 191–234 (1996). While some restrictions related to the COVID-19 pandemic have been found, for example, to infringe the right to free exercise of religion under the First Amendment, *see, e.g.*, *Roman Catholic Diocese,* 141 S. Ct. 63, the EOs at issue here are well within the acceptable scope of state power to address a lethal pandemic. They do not violate the constitutional rights of New Jersey's residents.

I find the plaintiffs are unlikely to succeed on the merits of their First Amendment claim, and therefore will deny the motion for a preliminary injunction on those grounds.

## V.   CONCLUSION

For the reasons set forth above, plaintiffs' motion for a preliminary injunction (DE 12) is **DENIED**. A separate order will issue.

Dated: December 7, 2021

/s/ Kevin McNulty

_____
**Hon. Kevin McNulty**
**United States District Judge**

26